# NATIONAL LABOR RELATIONS BOARD *v.* ALLIS-CHALMERS MANUFACTURING CO. ET AL.

No. 216.   Argued March 15, 1967.—Decided June 12, 1967.

*Solicitor General Marshall* argued the cause for petitioner. With him on the brief were *Robert S. Rifkind, Arnold Ordman, Dominick L. Manoli* and *Norton J. Come. John Silard* argued the cause for respondent International Union, UAW–AFL–CIO (Locals 248 and 401), on behalf of the petitioner. With him on the brief were *Joseph L. Rauh, Jr., Stephen I. Schlossberg* and *Harriett R. Taylor.*

*Howard C. Equitz* argued the cause for respondent Allis-Chalmers Manufacturing Co. With him on the brief were *Maxwell H. Herriott, James A. Urdan, John L. Waddleton, Edward L. Welch* and *William J. McGowan.*

*Martin C. Seham* argued the cause and filed a brief for the New York Times Display Advertising Salesmen Steering Committee, as *amicus curiae,* urging affirmance.

MR. JUSTICE BRENNAN delivered the opinion of the Court.

The question here is whether a union which threatened and imposed fines, and brought suit for their collection, against members who crossed the union's picket line and went to work during an authorized strike against their employer, committed the unfair labor practice under § 8 (b)(1)(A) of the National Labor Relations Act of engaging in conduct "to restrain or coerce" employees in the exercise of their right guaranteed by § 7 to "refrain from" concerted activities.[1]

---

[1] The relevant provisions of §§ 7 and 8 (b)(1)(A), 61 Stat. 140, 141, 29 U. S. C. §§ 157 and 158 (b)(1)(A), are

"SEC. 7. Employees shall have the right to . . . engage in . . . concerted activities . . . , and shall also have the right to refrain from any or all of such activities . . . ."

"SEC. 8 (b). It shall be an unfair labor practice for a labor organization or its agents—

"(1) to restrain or coerce (A) employees in the exercise of the rights guaranteed in section 7: *Provided,* That this paragraph shall

Employees at the West Allis, and La Crosse, Wisconsin, plants of respondent Allis-Chalmers Manufacturing Company were represented by locals of the United Automobile Workers. Lawful economic strikes were conducted at both plants in support of new contract demands. In compliance with the UAW constitution, the strikes were called with the approval of the International Union after at least two-thirds of the members of each local voted by secret ballot to strike. Some members of each local crossed the picket lines and worked during the strikes. After the strikes were over, the locals brought proceedings against these members charging them with violation of the International constitution and bylaws. The charges were heard by local trial committees in proceedings at which the charged members were represented by counsel. No claim of unfairness in the proceedings is made. The trials resulted in each charged member being found guilty of "conduct unbecoming a Union member" and being fined in a sum from $20 to $100. Some of the fined members did not pay the fines and one of the locals obtained a judgment in the amount of the fine against one of its members, Benjamin Natzke, in a test suit brought in the Milwaukee County Court. An appeal from the judgment is pending in the Wisconsin Supreme Court.

Allis-Chalmers filed unfair labor practice charges against the locals alleging violation of § 8 (b)(1)(A).[2]

---

not impair the right of a labor organization to prescribe its own rules with respect to the acquisition or retention of membership therein . . . ."

[2] Two locals were involved, Local 248 at the West Allis plant, and Local 401 at the La Crosse plant. Although Allis-Chalmers' charges of unfair labor practices mentioned threats of fines as well as imposition of fines, the only proof that fines were specifically threatened during a strike consisted of a letter to strikebreaking West Allis members of Local 248 in 1959. As to the 1962 strike at West Allis and both the 1959 and 1962 strikes at La Crosse, men-

A complaint issued and after hearing a trial examiner recommended its dismissal. The National Labor Relations Board sustained the examiner on the ground that, in the circumstances of this case, the actions of the locals, even if restraint or coercion prohibited by § 8 (b)(1)(A), constituted conduct excepted from the section's prohibitions by the proviso that such prohibitions "shall not impair the right of a labor organization to prescribe its own rules with respect to the acquisition or retention of membership therein." 149 N. L. R. B. 67. Upon Allis-Chalmers' petition for review to the Court of Appeals for the Seventh Circuit, a panel of that court upheld the Board's decision. Following a rehearing *en banc,* however, the court, three judges dissenting, withdrew the panel opinion, held that the locals' conduct violated § 8 (b)(1)(A), and remanded to the Board for appropriate proceedings. 358 F. 2d 656. We granted certiorari, 385 U. S. 810. We reverse.

## I.

The panel and the majority *en banc* of the Court of Appeals thought that reversal of the NLRB order would be required under a literal reading of §§ 7 and 8 (b)(1)(A); under that reading union members who cross their own picket lines would be regarded as exercising their rights under § 7 to refrain from engaging in a particular concerted activity, and union discipline in the form of fines for such activity would therefore "restrain or coerce" in violation of § 8 (b)(1)(A) if the section's proviso is read to sanction no form of discipline other

tion of fines first occurred after the strikes were over. The threat of court enforcement of the fines was first made in 1960 in letters sent to fined members of Local 248 who had not paid their fines; the letter informed them of the outcome of a Wisconsin Supreme Court opinion holding fines enforceable, *UAW, Local 756* v. *Woychik,* 5 Wis. 2d 528, 93 N. W. 2d 336 (1958). Local 401's test suit was brought after the 1962 strike.

than expulsion from the union. The panel rejected that literal reading. The majority *en banc* adopted it, stating that the panel "mistakenly took the position that such a literal reading was unwarranted in the light of the history and purposes" of the sections, 358 F. 2d, at 659, and holding that "[t]he statutes in question present no ambiguities whatsoever, and therefore do not require recourse to legislative history for clarification." *Id.,* at 660.

It is highly unrealistic to regard § 8 (b)(1), and particularly its words "restrain or coerce," as precisely and unambiguously covering the union conduct involved in this case. On its face court enforcement of fines imposed on members for violation of membership obligations is no more conduct to "restrain or coerce" satisfaction of such obligations than court enforcement of penalties imposed on citizens for violation of their obligations as citizens to pay income taxes, or court awards of damages against a contracting party for nonperformance of a contractual obligation voluntarily undertaken. But even if the inherent imprecision of the words "restrain or coerce" may be overlooked, recourse to legislative history to determine the sense in which Congress used the words is not foreclosed. We have only this Term again admonished that labor legislation is peculiarly the product of legislative compromise of strongly held views, *Local 1976, Carpenters' Union* v. *Labor Board,* 357 U. S. 93, 99–100, and that legislative history may not be disregarded merely because it is arguable that a provision may unambiguously embrace conduct called in question. *National Woodwork Mfrs. Assn.* v. *NLRB,* 386 U. S. 612, 619–620. Indeed, we have applied that principle to the construction of § 8 (b)(1)(A) itself in holding that the section must be construed in light of the fact that it "is only one of many interwoven sections in a complex Act, mindful of the manifest purpose of

the Congress to fashion a coherent national labor policy." *Labor Board* v. *Drivers Local Union,* 362 U. S. 274, 292.

National labor policy has been built on the premise that by pooling their economic strength and acting through a labor organization freely chosen by the majority, the employees of an appropriate unit have the most effective means of bargaining for improvements in wages, hours, and working conditions. The policy therefore extinguishes the individual employee's power to order his own relations with his employer and creates a power vested in the chosen representative to act in the interests of all employees. "Congress has seen fit to clothe the bargaining representative with powers comparable to those possessed by a legislative body both to create and restrict the rights of those whom it represents . . . ." *Steele* v. *Louisville & N. R. Co.,* 323 U. S. 192, 202. Thus only the union may contract the employee's terms and conditions of employment,[3] and provisions for processing his grievances; the union may even bargain away his right to strike during the contract term,[4] and his right to refuse to cross a lawful picket line.[5] The employee may disagree with many of the union decisions but is bound by them. "The majority-rule concept is today unquestionably at the center of our federal labor policy."[6] "The complete satisfaction of all who are represented is hardly to be expected. A wide range of reasonableness must be allowed a statutory bargaining representative in serving the unit it represents, subject always to complete good faith and honesty of purpose in the exercise of its discretion." *Ford Motor Co.* v. *Huffman,* 345 U. S. 330, 338.

---

[3] See *J. I. Case Co.* v. *Labor Board,* 321 U. S. 332; *Medo Photo Supply Corp.* v. *Labor Board,* 321 U. S. 678; *ILGWU* v. *Labor Board,* 366 U. S. 731, 737.

[4] See *Mastro Plastics Corp.* v. *Labor Board,* 350 U. S. 270, 280.

[5] See *Labor Board* v. *Rockaway News Co.,* 345 U. S. 71.

[6] Wellington, Union Democracy and Fair Representation: Federal Responsibility in a Federal System, 67 Yale L. J. 1327, 1333 (1958).

It was because the national labor policy vested unions with power to order the relations of employees with their employer that this Court found it necessary to fashion the duty of fair representation. That duty "has stood as a bulwark to prevent arbitrary union conduct against individuals stripped of traditional forms of redress by the provisions of federal labor law." *Vaca* v. *Sipes,* 386 U. S. 171, 182. For the same reason Congress in the 1959 Landrum-Griffin amendments, 73 Stat. 519, enacted a code of fairness to assure democratic conduct of union affairs by provisions guaranteeing free speech and assembly, equal rights to vote in elections, to attend meetings, and to participate in the deliberations and voting upon the business conducted at the meetings.

Integral to this federal labor policy has been the power in the chosen union to protect against erosion its status under that policy through reasonable discipline of members who violate rules and regulations governing membership.[7] That power is particularly vital when the members engage in strikes. The economic strike against the employer is the ultimate weapon in labor's arsenal for achieving agreement upon its terms, and "[t]he power to fine or expel strikebreakers is essential if the union is to be an effective bargaining agent . . . ."[8] Provisions in

---

[7] See, *e. g.*, Summers, Legal Limitations on Union Discipline, 64 Harv. L. Rev. 1049 (1951); Philip Taft, The Structure and Government of Labor Unions 117–180 (1954); Taylor, The Role of Unions in a Democratic Society, Selected Readings on Government Regulation of Internal Union Affairs Affecting the Rights of Members, prepared for the Subcommittee on Labor of the Senate Committee on Labor and Public Welfare 17 (Committee Print, 85th Cong., 2d Sess., 1958) (hereafter Selected Readings); Kerr, Unions and Union Leaders of Their Own Choosing, Selected Readings, *supra,* at 106, 109.

[8] Summers, *supra,* n. 7, at 1049.

"Strikebreaking is uniformly considered sufficient reason for expulsion whether or not there is an express prohibition, for it undercuts the union's principal weapon and defeats the economic objective for

union constitutions and bylaws for fines and expulsion of recalcitrants, including strikebreakers, are therefore commonplace and were commonplace at the time of the Taft-Hartley amendments.[9]

In addition, the judicial view current at the time § 8 (b)(1)(A) was passed was that provisions defining punishable conduct and the procedures for trial and appeal constituted part of the contract between member and union and that "The courts' role is but to enforce the contract."[10] In *Machinists* v. *Gonzales*, 356 U. S. 617, 618, we recognized that "[t]his contractual conception of the relation between a member and his union widely prevails in this country . . . ." Although state courts were reluctant to intervene in internal union affairs, a body of law establishing standards of fairness in the enforcement of union discipline grew up around this con-

---

which the union exists." Summers, Disciplinary Powers of Unions, 3 Ind. & Lab. Rel. Rev. 483, 495 (1950).

[9] National Industrial Conference Board, The Union, The Leader, and The Members, Selected Readings, at 40, 69–71; Summers, Disciplinary Powers of Unions, 3 Ind. & Lab. Rel. Rev. 483, 508–512 (1950); Disciplinary Powers and Procedures in Union Constitutions, U. S. Dept. of Labor Bulletin No. 1350, Bur. Lab. Statistics (1963).

It is suggested that while such provisions for fines and expulsion were a common element of union constitutions at the time of the enactment of § 8 (b)(1), such background loses its cogency here because such provisions did not explicitly call for court enforcement. However the potentiality of resort to courts for enforcement is implicit in any binding obligation. Surely it cannot be said that the absence of a "court enforceability" clause in a contract of sale implies that the parties do not foresee resort to the courts as a possible means of enforcement. It is also suggested that court enforcement of fines is "a rather recent innovation." Yet such enforcement was known as early as 1867. *Master Stevedores' Assn.* v. *Walsh,* 2 Daly 1 (N. Y.).

[10] Summers, The Law of Union Discipline: What the Courts Do in Fact, 70 Yale L. J. 175, 180 (1960).

tract doctrine. See *Parks* v. *Electrical Workers,* 314 F. 2d 886, 902–903.[11]

To say that Congress meant in 1947 by the § 7 amendments and § 8 (b)(1)(A) to strip unions of the power to fine members for strikebreaking, however lawful the strike vote, and however fair the disciplinary procedures and penalty, is to say that Congress preceded the Landrum-Griffin amendments with an even more pervasive regulation of the internal affairs of unions. It is also to attribute to Congress an intent at war with the understanding of the union-membership relation which has been at the heart of its effort "to fashion a coherent labor policy" and which has been a predicate underlying action by this Court and the state courts. More importantly, it is to say that Congress limited unions in the powers necessary to the discharge of their role as exclusive statutory bargaining agents by impairing the usefulness of labor's cherished strike weapon. It is no answer that the proviso to § 8 (b)(1)(A) preserves to the union the power to expel the offending member. Where the union is strong and membership therefore valuable, to require expulsion of the member visits a far more severe penalty upon the member than a reasonable fine. Where the union is weak, and membership therefore of little value, the union faced with further depletion of its ranks may have no real choice except to condone the member's disobedience.[12]

---

[11] See generally Chafee, The Internal Affairs of Associations Not for Profit, 43 Harv. L. Rev. 993 (1930); Note, Judicial Control of Actions of Private Associations, 76 Harv. L. Rev. 983 (1963); Cox, Internal Affairs of Labor Unions Under the Labor Reform Act of 1959, 58 Mich. L. Rev. 819, 835–836 (1960).

[12] "Since the union's effectiveness is based largely on the degree to which it controls the available labor, expulsions tend to weaken the union. If large numbers are expelled, they become a threat to union standards by undercutting union rates, and in case of a strike they may act as strikebreakers. . . . Therefore, expulsions must

Yet it is just such weak unions for which the power to execute union decisions taken for the benefit of all employees is most critical to effective discharge of its statutory function.

Congressional meaning is of course ordinarily to be discerned in the words Congress uses. But when the literal application of the imprecise words "restrain or coerce" Congress employed in § 8 (b)(1)(A) produces the extraordinary results we have mentioned we should determine whether this meaning is confirmed in the legislative history of the section.

## II.

The explicit wording of § 8 (b)(2), which is concerned with union powers to affect a member's employment, is in sharp contrast with the imprecise words of § 8 (b)(1)(A). Section 8 (b)(2) limits union power to compel an employer to discharge a terminated member other than for "failure [of the employee] to tender the periodic dues and the initiation fees uniformly required as a condition of acquiring or retaining membership." It is significant that Congress expressly disclaimed in this connection any intention to interfere with union self-government or to regulate a union's internal affairs. The Senate Report stated:

> "The committee did not desire to limit the labor organization with respect to either its selection of membership or expulsion therefrom. But the committee did wish to protect the employee in his job if unreasonably expelled or denied membership. The tests provided by the amendment are based upon facts readily ascertainable and *do not require*

be limited to very small numbers unless the union is so strongly entrenched that it cannot be effectively challenged by the employer or another union." Summers, Disciplinary Powers of Unions, 3 Ind. & Lab. Rel. Rev. 483, 487–488 (1950).

*the employer to inquire into the internal affairs of the union."* S. Rep. No. 105, 80th Cong., 1st Sess., 20, I Legislative History of the Labor Management Relations Act, 1947 (hereafter Leg. Hist.) 426. (Emphasis supplied.)

Senator Taft, in answer to protestations by Senator Pepper that § 8 (b)(2) would intervene in the union's internal affairs and "deny it the right to protect itself against a man in the union who betrays the objectives of the union . . . ," stated:

> *"The pending measure does not propose any limitation with respect to the internal affairs of unions.* They still will be able to fire any members they wish to fire, *and they still will be able to try any of their members.* All that they will not be able to do, after the enactment of this bill, is this: If they fire a member for some reason other than nonpayment of dues they cannot make his employer discharge him from his job and throw him out of work. That is the only result of the provision under discussion." [13]  (Emphasis supplied.)

Section 8 (b)(1)(A) was under consideration when Senator Taft said this. Congressional emphasis that § 8 (b)(2) insulated an employee's membership from his job, but left internal union affairs to union self-government, is therefore significant evidence against reading § 8 (b)(1)(A) as contemplating regulation of internal discipline. This is borne out by the fact that provision was also made in the Taft-Hartley Act for a special committee to study, among other things, "the internal organization and administration of labor unions . . . ." § 402 (3), 61 Stat. 160.

What legislative materials there are dealing with § 8 (b)(1)(A) contain not a single word referring to the

---

[13] 93 Cong. Rec. 4193, II Leg. Hist. 1097.

application of its prohibitions to traditional internal union discipline in general, or disciplinary fines in particular. On the contrary there are a number of assurances by its sponsors that the section was not meant to regulate the internal affairs of unions.

The provision was not contained in the Senate or House bills reported out of committee, but was introduced as an amendment on the Senate floor by Senator Ball. The amendment was adopted in the Conference Committee, without significant enlightenment from the report of that committee. The first suggestion that restraint or coercion of employees in the exercise of § 7 rights should be an unfair labor practice appears in the Statement of Supplemental Views to the Senate Report, in which a minority of the Senate Committee, including Senators Ball, Taft, and Smith, concurred. The mischief against which the Statement inveighed was restraint and coercion by unions in *organizational campaigns*. "The committee heard many instances of union coercion of employees such as that brought about by threats of reprisal against employees and their families in the course of organizing campaigns; also direct interference by mass picketing and other violence." S. Rep. No. 105, *supra,* at 50, I Leg. Hist. 456. Senator Ball proposed § 8 (b)(1)(A) as an amendment to the Senate bill, and stated, "The purpose of the amendment is simply to provide that where unions, in their organizational campaigns, indulge in practices which, if an employer indulged in them, would be unfair labor practices, such as making threats or false promises or false statements, the unions also shall be guilty of unfair labor practices." 93 Cong. Rec. 4016, II Leg. Hist. 1018. Senator Ball gave numerous examples of the kind of union conduct the amendment was to cover. Each one related to union conduct during organizational cam-

paigns.[14]  Senator Ball reiterated this purpose several times thereafter,[15] including remarks added after passage of the amendment.[16]  The consistent thrust of his arguments was the necessity of controlling union conduct in organizational campaigns.  Indeed, when Senator Holland introduced the proviso eliminating from the reach of § 8 (b)(1)(A) "the right of a labor organization to prescribe its own rules with respect to the acquisition or retention of membership . . . ," Senator Ball replied,

> "I merely wish to state to the Senate that the amendment offered by the Senator from Florida is perfectly agreeable to me. *It was never the intention of the sponsors of the pending amendment to interfere with the internal affairs or organization of unions."* [17]  (Emphasis supplied.)

After acceptance of the proviso, and on the same day as the vote on the amendment itself, Senator Ball said of the proviso: "That modification is designed to make it clear that we are not trying to interfere with the internal affairs of a union which is already organized.  All we are trying to cover is the coercive and restraining acts of the union in its effort to organize unorganized employees." [18]

Another co-sponsor of the amendment, Senator Smith, echoed this purpose: "The pending measure is designed

---

[14] 93 Cong. Rec. 4016–4017, II Leg. Hist. 1018–1021.  Examples were given in debate of threats by unions to double the dues of employees who waited until later to join.  It is suggested that this is no less within the ambit of internal union affairs than the fines imposed in the present case.  But the significant distinction is that the cited examples necessarily concern threats against nonmembers designed to coerce them into joining, and are therefore further evidence of the primary concern of Congress with organizational tactics.

[15] 93 Cong. Rec. 4271, 4432, 4434, II Leg. Hist. 1139, 1199, 1203.

[16] 93 Cong. Rec. A–2252, II Leg. Hist. 1524–1525.

[17] 93 Cong. Rec. 4272, II Leg. Hist. 1141.

[18] 93 Cong. Rec. 4433, II Leg. Hist. 1200.

to protect employees in their freedom to decide whether or not they desire to join labor organizations, to prevent them from being restrained or coerced." [19]

Senator Taft also initially confined his comments on the amendment to examples of organizational tactics. [20] However, in debate with Senator Pepper, he suggested a broader but still limited application:

> "If there is anything clear in the development of labor union history in the past 10 years it is that more and more labor union employees have come to be subject to the orders of labor union leaders. The bill provides for the right to protest against *arbitrary powers which have been exercised by some of the labor union leaders."* [21]  (Emphasis supplied.)

In reply to Senator Pepper's protest that union members can protect themselves against such "tyranny," Senator Taft stated, "I think it is fair to say that in the case of many of the unions, the employee has a good deal more of an opportunity to select his employer than he has to select his labor-union leader." [22]  Senator Taft further observed that union leaders sometimes penalize those who vote against them.  Senator Pepper then attempted to draw an analogy between union members and shareholders in a corporation, to which Senator Taft replied, "The Congress has gone much further in protecting the rights of minority stockholders in corporations than it has in protecting the rights of members of unions.  *Even*

---

[19] 93 Cong. Rec. 4435, II Leg. Hist. 1204.

[20] 93 Cong. Rec. 4021–4022, II Leg. Hist. 1025–1027.

[21] 93 Cong. Rec. 4023, II Leg. Hist. 1028.

See Summers, Disciplinary Powers of Unions, 3 Ind. & Lab. Rel. Rev. 483: "It is significant that among the major changes made in the Wagner Act by the Labor Management Relations Act of 1947 was the addition of sections purported to be aimed at protecting individual union members against undemocratic and corrupt leaders."

[22] 93 Cong. Rec. 4023, II Leg. Hist. 1028.

*in this bill we do not tell the unions how they shall vote
or how they shall conduct their affairs . . . ."* [23]   (Emphasis supplied.)   Senator Pepper attempted twice to clarify
the effect of the amendment on internal affairs, but Senator Taft answered only that the amendment applied to
nonunion men as well.[24]

It was one week after this debate between Senator
Taft and Senator Pepper that § 8 (b)(1)(A) was adopted
by the Senate as an amendment to the bill.   There was
no further reference in the debates to the applicability
of the section to internal union affairs, by Senator Taft
or anyone else, despite the repeated statements by Senator Ball that it bore no relationship to the conduct of
such affairs.   At one point, Senator Saltonstall asked
Senator Taft to provide examples of the kind of union
conduct covered by the section.   Senator Taft responded
with examples of threats of bodily harm, economic coercion, and mass picketing in organizational campaigns and
coercion which prevented employees not involved in a
labor dispute from going to work.[25]   But any inference

[23] 93 Cong. Rec. 4024, II Leg. Hist. 1030.  It was in the context
of the quoted limiting statements that, in answer to Senator Ives'
suggestion that the matter of union coercion should be further investigated, Senator Taft made the broad remark that "[m]erely to
require that unions be subject to the same rules that govern employers, and that they do not have the right to interfere with or
coerce employees, either their own members or those outside their
union, is such a clear matter, and seems to me so easy to determine,
that I would hope we would all agree."  93 Cong. Rec. 4025, II Leg.
Hist. 1032.

[24] 93 Cong. Rec. 4023, 4024, II Leg. Hist. 1029, 1030.  It is this
colloquy to which the dissent apparently refers in its statement that
in answer to Senator Pepper's charge that the amendment protected
workers against their own leaders, "Senator Taft did not deny it."
It may be more accurate to say that Senator Taft evaded the issue.

[25] 93 Cong. Rec. 4435–4436, II Leg. Hist. 1205–1206.  The following statement of Senator Taft had no reference to the conduct of
a union *vis-à-vis* a member who crossed the union's picket line but

that Senator Taft envisioned that § 8 (b)(1)(A) intruded into and regulated internal union affairs is negated by his categorical statements to the contrary in the contemporaneous debates on § 8 (b)(2).

It is true that there are references in the Senate debate on § 8 (b)(1)(A) to an intent to impose the same prohibitions on unions that applied to employers as regards restraint and coercion of employees in their exercise of § 7 rights.[26] However apposite this parallel might be when applied to organizational tactics, it clearly is in-

referred to union conduct in preventing employees not in the bargaining unit from going to work—"mass picketing, which absolutely prevents all the office force from going into the office of a plant."

"The effect of the pending amendment is that the Board may call the union before them, exactly as it has called the employer, and say, 'Here are the rules of the game. You must cease and desist from coercing and restraining the employees who want to work from going to work ˆand earning the money which they are entitled to earn.' The Board may say, 'You can persuade them; you can put up signs; you can conduct any form of propaganda you want to in order to persuade them, but you cannot, by threat of force or threat of economic reprisal, prevent them from exercising their right to work.' As I see it, that is the effect of the amendment." 93 Cong. Rec. 4436, II Leg. Hist. 1206.

His statements in a colloquy with Senator Morse were made in the same context. 93 Cong. Rec. 4436, II Leg. Hist. 1207. We read his "Supplementary Analysis of Labor Bill as Passed" as also referring to coercion of nonmembers of the striking bargaining unit. 93 Cong. Rec. 6859, II Leg. Hist. 1623. That he distinguished members from nonmembers also appears from his statement concerning the section that "[i]ts application to *labor organizations* may have a slightly different implication, but it seems to me perfectly clear that from the point of view of the *employee* the two cases are parallel." 93 Cong. Rec. 4023, II Leg. Hist. 1028. (Emphasis supplied.)

It is not true that "the sponsors of the section repeatedly announced that it would protect union members from their leaders." Only Senator Taft's statements provide limited support for the proposition.

[26] S. Rep. No. 105, 80th Cong., 1st Sess., 50, I Leg. Hist. 456; 93 Cong. Rec. 4025, 4436, II Leg. Hist. 1032, 1207.

applicable to the relationship of a union member to his own union. Union membership allows the member a part in choosing the very course of action to which he refuses to adhere, but he has of course no role in employer conduct, and nonunion employees have no voice in the affairs of the union.[27]

Cogent support for an interpretation of the body of § 8 (b)(1) as not reaching the imposition of fines and attempts at court enforcement is the proviso to § 8 (b)(1). It states that nothing in the section shall "impair the right of a labor organization to prescribe its own rules with respect to the acquisition or retention of membership therein . . . ." Senator Holland offered the proviso during debate and Senator Ball immediately accepted it, stating that it was not the intent of the sponsors in any way to regulate the internal affairs of unions.[28] At the very least it can be said that the proviso preserves the rights of unions to impose fines, as a lesser penalty than

---

[27] Cf. statement of Justice Stone in *South Carolina Hwy. Dept.* v. *Barnwell Bros.*, 303 U. S. 177, 184–185, n. 2:

"State regulations affecting interstate commerce, whose purpose or effect is to gain for those within the state an advantage at the expense of those without, or to burden those out of the state without any corresponding advantage to those within, have been thought to impinge upon the constitutional prohibition even though Congress has not acted. [Citations omitted.]

"Underlying the stated rule has been the thought, often expressed in judicial opinion, that *when the regulation is of such a character that its burden falls principally upon those without the state, legislative action is not likely to be subjected to those political restraints which are normally exerted on legislation where it affects adversely some interests within the state.*" (Emphasis supplied.)

A commentator has noted that "the ballot in a free election is the individual union member's weapon for inducing performance in accordance with his desire." Wellington, Union Democracy and Fair Representation: Federal Responsibility in a Federal System, 67 Yale L. J. 1327, 1329 (1958).

[28] 93 Cong. Rec. 4272, 4433, II Leg. Hist. 1141, 1200.

expulsion, and to impose fines which carry the explicit or implicit threat of expulsion for nonpayment. Therefore, under the proviso the rule in the UAW constitution governing fines is valid and the fines themselves and expulsion for nonpayment would not be an unfair labor practice. Assuming that the proviso cannot also be read to authorize court enforcement of fines, a question we need not reach,[29] the fact remains that to interpret the body of § 8 (b)(1) to apply to the imposition and collection of fines would be to impute to Congress a concern with the permissible *means* of enforcement of union fines and to attribute to Congress a narrow and discrete interest in banning court enforcement of such fines. Yet there is not one word in the legislative history evidencing any such congressional concern. And, as we have pointed out, a distinction between court enforcement and expulsion would have been anomalous for several reasons. First, Congress was operating within the context of the "contract theory" of the union-member relationship which widely prevailed at that time. The efficacy of a contract is precisely its legal enforceability. A lawsuit is and has been the ordinary way by which performance of private money obligations is compelled. Second, as we have noted, such a distinction would visit upon the member of a strong union a potentially more severe punishment than court enforcement of fines, while impairing the bargaining facility of the weak union by requiring it either to condone misconduct or deplete its ranks.

There may be concern that court enforcement may permit the collection of unreasonably large fines.[30] How-

---

[29] Our conclusion that § 8 (b)(1)(A) does not prohibit the locals' actions makes it unnecessary to pass on the Board holding that the proviso protected such actions.

[30] The notification by Local 248 to its strikebreaking employees that each day they continued to work might constitute a separate

ever, even were there evidence that Congress shared this concern,[31] this would not justify reading the Act also to bar court enforcement of reasonable fines.[32]

The 1959 Landrum-Griffin amendments, thought to be the first comprehensive regulation by Congress of the conduct of internal union affairs,[33] also negate the reach

offense punishable by a fine of $100 was sent only to members of Local 248, not those of Local 401, and only during one of the two strikes called by Local 248. The notification was sent only to those employees who had already decided to work during the strike. Most important, no inference can be drawn from that notification that court enforcement would be the means of collection. Therefore, at least under the proviso, if not the body of § 8 (b)(1)́, such notification would not be an unfair labor practice. It is not argued that the fines for which court enforcement was actually "sought were unreasonably large.

[31] Senator Wiley's reference in a speech after § 8 (b)(1) was passed to $20,000 fines for crossing a picket line was not directed to the section. 93 Cong. Rec. 5000, II Leg. Hist. 1471.

[32] It has been noted that the state courts, in reviewing the imposition of union discipline, find ways to strike down "discipline [which] involves a severe hardship." Summers, Legal Limitations on Union Discipline, 64 Harv. L. Rev. 1049, 1078 (1951).

It is suggested that reading § 8 (b)(1) to allow court enforcement of fines adds a "new weapon to the union's economic arsenal," and is inconsistent with the mood of Congress to curtail the powers of unions. The question here, however, is not whether Congress gave to unions a new power, but whether it eliminated, without debate, a power which the unions already possessed.

[33] In 1958, in *Machinists* v. *Gonzales,* 356 U. S. 617, 620, we said: "[T]he protection of union members in their rights as members from arbitrary conduct by unions and union officers has not been undertaken by federal law, and indeed the assertion of any such power has been expressly denied."

See Cox, Internal Affairs of Labor Unions Under the Labor Reform Act of 1959, 58 Mich. L. Rev. 819, 852:

"The act is the first major step in the regulation of the internal affairs of labor unions. It expands the national labor policy into the area of relations between the employees and the labor union. Previously national policy was confined to relationships between management and union."

given § 8 (b)(1)(A) by the majority *en banc* below. "To be sure, what Congress did in 1959 does not establish what it meant in 1947. However, as another major step in an evolving pattern of regulation of union conduct, the 1959 Act is a relevant consideration. Courts may properly take into account the later Act when asked to extend the reach of the earlier Act's vague language to the limits which, read literally, the words might permit." *Labor Board* v. *Drivers Local Union,* 362 U. S. 274, 291–292. In 1959 Congress did seek to protect union members in their relationship to the union by adopting measures to insure the provision of democratic processes in the conduct of union affairs and procedural due process to members subjected to discipline. Even then, some Senators emphasized that "in establishing and enforcing statutory standards great care should be taken not to undermine union self-government or weaken unions in their role as collective-bargaining agents." S. Rep. No. 187, 86th Cong., 1st Sess., 7. The Eighty-sixth Congress was thus plainly of the view that union self-government was not regulated in 1947. Indeed, that Congress expressly recognized that a union member may be "fined, suspended, expelled, or otherwise disciplined," and enacted only procedural requirements to be observed. 73 Stat. 523, 29 U. S. C. § 411 (a)(5). Moreover, Congress added a proviso to the guarantee of freedom of speech and assembly disclaiming any intent "to impair the right of a labor organization to adopt and enforce reasonable rules as to the responsibility of every member toward the organization as an institution . . . ." 29 U. S. C. § 411 (a)(2).

The 1959 provisions are significant for still another reason. We have seen that the only indication in the debates over § 8 (b)(1)(A) of a reach beyond organizational tactics which restrain or coerce nonmembers was Senator Taft's concern with arbitrary and undemocratic

union leadership. The 1959 amendments are addressed to that concern. The kind of regulation of internal union affairs which Senator Taft said protected stockholders of a corporation, and made necessary a "right of protest against arbitrary powers which have been exercised by some of the labor union leaders," [34] is embodied in the 1959 Act. The requirements of adherence to democratic principles, fair procedures and freedom of speech apply to the election of union officials and extend into all aspects of union affairs. [35] In the present case the procedures followed for calling the strikes and disciplining the recalcitrant members fully comported with these requirements, and were in every way fair and democratic. Whether § 8 (b)(1)(A) proscribes arbitrary imposition of fines, or punishment for disobedience of a fiat of a union leader, are matters not presented by this case, and upon which we express no view.

Thus this history of congressional action does not support a conclusion that the Taft-Hartley prohibitions against restraint or coercion of an employee to refrain from concerted activities included a prohibition against the imposition of fines on members who decline to honor an authorized strike and attempts to collect such fines. Rather, the contrary inference is more justified in light of the repeated refrain throughout the debates on § 8 (b) (1)(A) and other sections that Congress did not propose any limitations with respect to the internal affairs of unions, aside from barring enforcement of a union's internal regulations to affect a member's employment status.

[34] 93 Cong. Rec. 4023, II Leg. Hist. 1028.

[35] 29 U. S. C. §§ 411–415, 431 (c), 461–464, 481–482. Significantly, the Landrum-Griffin amendments expressly rendered it unlawful for any union "to fine, suspend, expel, or otherwise discipline any of its members for exercising any right to which he is entitled . . ." under that Act. 29 U. S. C. § 529.

## III.

The collective bargaining agreements with the locals incorporate union security clauses. Full union membership is not compelled by the clauses: an employee is required only to become and remain "a member of the Union . . . to the extent of paying his monthly dues . . . ." The majority *en banc* below nevertheless regarded full membership to be "the result not of individual voluntary choice but of the insertion of [this] union security provision in the contract under which a substantial minority of the employees may have been forced into membership." 358 F. 2d, at 660. But the relevant inquiry here is not what motivated a member's full membership but whether the Taft-Hartley amendments prohibited disciplinary measures against a full member who crossed his union's picket line. It is clear that the fined employees involved herein enjoyed full union membership. Each executed the pledge of allegiance to the UAW constitution and took the oath of full membership. Moreover, the record of the Milwaukee County Court case against Benjamin Natzke discloses that two disciplined employees testified that they had fully participated in the proceedings leading to the strike. They attended the meetings at which the secret strike vote and the renewed strike vote were taken. It was upon this and similar evidence that the Milwaukee County Court found that Natzke "had by his actions become a member of the union for all purposes . . . ." Allis-Chalmers offered no evidence in this proceeding that any of the fined employees enjoyed other than full union membership. We will not presume the contrary. Cf. *Machinists* v. *Street,* 367 U. S. 740, 774.[36] Indeed, it

---

[36] In *Machinists* v. *Street,* we held that employees who were members of a union under a union security agreement authorized by the

is and has been Allis-Chalmers' position that the Taft-Hartley prohibitions apply whatever the nature of the membership. Whether those prohibitions would apply if the locals had imposed fines on members whose membership was in fact limited to the obligation of paying monthly dues is a question not before us and upon which we intimate no view.[37]

The judgment of the Court of Appeals is

*Reversed.*

MR. JUSTICE WHITE, concurring.

It is true that § 8 (b)(1)(A) makes it an unfair labor practice for a union to restrain or coerce any employees in the exercise of § 7 rights, but the proviso permits the union to make its own rules with respect to acquisition and retention of membership. Hence, a union may expel to enforce its own internal rules, even though a particular rule limits the § 7 rights of its members and

---

Railway Labor Act, had a right to relief against a union using their dues payments for political purposes. We said, at 774:

"Any remedies, however, would properly be granted only to employees who have made known to the union officials that they do not desire their funds to be used for political causes to which they object. The safeguards of [the Act] . . . were added for the protection of dissenters' interest, but dissent is not to be presumed—it must affirmatively be made known to the union by the dissenting employee. . . . Thus we think that only those who have identified themselves as opposed to political uses of their funds are entitled to relief in this action."

[37] Under § 8 (a)(3) the extent of an employee's obligation under a union security agreement is "expressly limited to the payment of initiation fees and monthly dues. . . . 'Membership' as a condition of employment is whittled down to its financial core." *Labor Board* v. *General Motors Corp.*, 373 U. S. 734, 742.

Not before us is the question of the extent to which union action for enforcement of disciplinary penalties is pre-empted by federal labor law. Compare *Machinists* v. *Gonzales*, 356 U. S. 617; *Plumbers' Union* v. *Borden*, 373 U. S. 690.

even though expulsion to enforce it would be a clear and serious brand of "coercion" imposed in derogation of those § 7 rights. Such restraint and coercion Congress permitted by adding the proviso to § 8 (b)(1)(A). Thus, neither the majority nor the dissent in this case questions the validity of the union rule against its members crossing picket lines during a properly called strike, or the propriety of expulsion to enforce the rule. Section 8 (b)(1)(A), therefore, does not bar *all* restraint and coercion by a union to prevent the exercise by its members of their § 7 rights. "Coercive" union rules are enforceable at least by expulsion.

The dissenting opinion in this case, although not questioning the enforceability of coercive rules by expulsion from membership, questions whether fines for violating such rules are enforceable at all, by expulsion or otherwise. The dissent would at least hold court collection of fines to be an unfair labor practice, apparently for the reason that fines collectible in court may be more coercive than fines enforceable by expulsion. My Brother BRENNAN, for the Court, takes a different view, reasoning that since expulsion would in many cases—certainly in this one involving a strong union—be a far more coercive technique for enforcing a union rule and for collecting a reasonable fine than the threat of court enforcement, there is no basis for thinking that Congress, having accepted expulsion as a permissible technique to enforce a rule in derogation of § 7 rights, nevertheless intended to bar enforcement by another method which may be far less coercive.

I do not mean to indicate, and I do not read the majority opinion otherwise, that every conceivable internal union rule which impinges upon the § 7 rights of union members is valid and enforceable by expulsion and court action. There may well be some internal union rules which on their face are wholly invalid and unenforceable.

But the Court seems unanimous in upholding the rule against crossing picket lines during a strike and its enforceability by expulsion from membership. On this premise I think the opinion written for the Court is the more persuasive and sensible construction of the statute and I therefore join it, although I am doubtful about the implications of some of its generalized statements.

MR. JUSTICE BLACK, whom MR. JUSTICE DOUGLAS, MR. JUSTICE HARLAN, and MR. JUSTICE STEWART join, dissenting.

The United Automobile Workers went on a lawful economic strike against the Allis-Chalmers Manufacturing Co. Some union members, refusing to engage in the concerted strike activities, crossed the picket lines and continued to work for Allis-Chalmers. The right to refrain from engaging in such "concerted activities" is guaranteed all employees by the language of § 7 of the National Labor Relations Act, as amended, 61 Stat. 140, and § 8 (b)(1)(A) of the Act, 61 Stat. 141, makes it an unfair labor practice for a union to "restrain or coerce" employees in their exercise of their § 7 rights. Despite these emphatic guarantees of the Act, the union filed charges against the employees and imposed fines against those who had crossed its picket lines to go back to work. Though the proviso to § 8 (b)(1)(A) preserves the union's "right . . . to prescribe its own rules with respect to the . . . retention of membership therein," the union did not attempt to exercise its right under the proviso to expel the disciplined members when they refused to pay the fines. Instead, it brought legal proceedings in state courts to compel the payment of the fines. The Court now affirms the Labor Board's action in refusing to find the union guilty of an unfair labor practice under § 8 (b)(1)(A) for fining its members because they

crossed its picket lines. I cannot agree and, therefore, would affirm the judgment of the Court of Appeals which set aside the Labor Board's order.

## I.

In determining what the Court here holds, it is helpful to note what it does not hold. Since the union resorted to the courts to enforce its fines instead of relying on its own internal sanctions such as expulsion from membership, the Court correctly assumes that the proviso to § 8 (b)(1)(A) cannot be read to authorize its holding. Neither does the Court attempt to sustain its holding by reference to § 7 which gives employees the right to refrain from engaging in concerted activities. To be sure, the Court in characterizing the union-member relationship as "contractual" and in emphasizing that its holding is limited to situations where the employee is a "full member" of the union, implies that by joining a union an employee gives up or waives some of his § 7 rights. But the Court does not say that a union member is without the § 7 right to refrain from participating in such concerted activity as an economic strike called by his union. Such a holding would be clearly unwarranted even by resort to the legislative history of the 1947 addition to § 7 of "the right to refrain from any or all of such activities." According to Senator Taft, that phrase was added by the Conference Committee to "make the prohibition contained in section 8 (b)(1) apply to coercive acts of unions against employees who did not wish to join *or did not care to participate in a strike or a picket line."* 93 Cong. Rec. 6859, II Leg. Hist. 1623. (Emphasis added.)

With no reliance on the proviso to § 8 (b)(1)(A) or on the meaning of § 7, the Court's holding boils down to this: a court-enforced reasonable fine for nonparticipation in a strike does not "restrain or coerce" an employee in the

exercise of his right not to participate in the strike. In holding as it does, the Court interprets the words "restrain or coerce" in a way directly opposed to their literal meaning, for the Court admits that fines are as coercive as penalties imposed on citizens for the nonpayment of taxes. Though Senator Taft, in answer to charges that these words were ambiguous, said their meaning "is perfectly clear," 93 Cong. Rec. 4021, II Leg. Hist. 1025, and though any union official with sufficient intelligence and learning to be chosen as such could hardly fail to comprehend the meaning of these plain, simple English words, the Court insists on finding an "inherent imprecision" in these words. And that characterization then allows the Court to resort to "[w]hat legislative materials there · are." In doing so, the Court finds three significant things: (1) there is "not a single word" to indicate that § 8 (b)(1)(A) was intended to apply to "traditional internal union discipline in general, or disciplinary fines in particular"; (2) the "repeated refrain" running through the debates on the section was that Congress did not intend to impose any limitations on the "internal affairs of unions"; (3) the Senators who supported the section were primarily concerned with union coercion during organizational drives and with union violence in general.

Even were I to agree with the Court's three observations about the legislative history of § 8 (b)(1)(A), I do not think they alone justify disregarding the plain meaning of the section, and it seems perfectly clear to me that the Court does not think so either. The real reason for the Court's decision is its policy judgment that unions, especially weak ones, need the power to impose fines on strikebreakers and to enforce those fines in court. It is not enough, says the Court, that the unions have the power to expel those members who refuse to participate in a strike or who fail to pay fines imposed on them for such

failure to participate; it is essential that weak unions have the choice between expulsion and court-enforced fines, simply because the latter are more effective in the sense of being more punitive. Though the entire mood of Congress in 1947 was to curtail the power of unions, as it had previously curtailed the power of employers, in order to equalize the power of the two, the Court is unwilling to believe that Congress intended to impair "the usefulness of labor's cherished strike weapon." [1] I cannot agree with this conclusion or subscribe to the Court's unarticulated premise that the Court has power to add a new weapon to the union's economic arsenal whenever the Court believes that the union needs that weapon. That is a job for Congress, not this Court.

## II.

Though the Court recognizes that a union fine is in fact coercive, it seeks support for its holding—that court-enforced fines are not prohibited by § 8 (b)(1)(A)—by reference to the proviso which authorizes a union to prescribe its own rules with respect to the retention of membership. The Court first assumes that the proviso protects the union's right to expel members for the express purpose of discouraging them from going to work. From that assumption the Court then suggests that "[a]t the very least . . . the proviso preserves the rights of unions to impose fines, as a lesser penalty than expulsion,

---

[1] Those members of the Senate who opposed § 8 (b)(1)(A) shared the Court's concern that it would impair the effectiveness of strikes. To that concern, Senator Taft replied:

"I can see nothing in the pending measure which . . . would in some way outlaw strikes. It would outlaw threats against employees. It would not outlaw anybody striking who wanted to strike. It would not prevent anyone using the strike in a legitimate way . . . . All it would do would be to outlaw such restraint and coercion as would prevent people from going to work if they wished to go to work." 93 Cong. Rec. 4436, II Leg. Hist. 1207.

and to impose fines which carry the . . . threat of expulsion for nonpayment." And finally, departing a third step further from the literal language of the proviso, the Court arrives at its holding that Congress could not have meant to preclude unions from the alternative of judicially enforcing fines.

Contrary to the Court, I am not at all certain that a union's right under the proviso to prescribe rules for the retention of membership includes the right to restrain a member from working by trying him on the vague charge of "conduct unbecoming a union member" and fining him for exercising his § 7 right of refusing to participate in a strike, even though the fine is only enforceable by expulsion from membership. It is one thing to say that Congress did not wish to interfere with the union's power, similar to that of any other kind of voluntary association, to prescribe specific conditions of membership. It is quite another thing to say that Congress intended to leave unions free to exercise a court-like power to try and punish members with a direct economic sanction for exercising their right to work. Just because a union might be free, under the proviso, to expel a member for crossing a picket line does not mean that Congress left unions free to threaten their members with fines. Even though a member may later discover that the threatened fine is only enforceable by expulsion, and in that sense a "lesser penalty," the direct threat of a fine, to a member normally unaware of the method the union might resort to for compelling its payment, would often be more coercive than a threat of expulsion.

Even on the assumption that § 8 (b)(1)(A) permits a union to fine a member as long as the fine is only enforceable by expulsion, the fundamental error of the Court's opinion is its failure to recognize the practical and theoretical difference between a court-enforced fine, as here, and a fine enforced by expulsion or less drastic

intra-union means.[2]   As the Court recognizes, expulsion for nonpayment of a fine may, especially in the case of a strong union, be more severe than judicial collection of the fine.   But, if the union membership has little value and if the fine is great, then court-enforcement of the fine may be more effective punishment, and that is precisely why the Court desires to provide weak unions with this alternative to expulsion, an alternative which is similar to a criminal court's power to imprison defendants who fail to pay fines.

In this case, each strikebreaking employee was fined from $20 to $100, and the union initiated a "test case" in state court to collect the fines.   In notifying the employees of the charges against them, however, the union warned them that each day they crossed the picket line and went to work might be considered a separate offense punishable by a fine of $100.   In several of the cases, the strikes lasted for many months.   Thus, although the union here imposed minimal fines for the purpose of its "test case," it is not too difficult to imagine a case where the fines will be so large that the threat of their imposition will absolutely restrain employees from going to work during a strike.   Although an employee might be willing to work even if it meant the loss of union membership, he would have to be well paid indeed to work at the risk that he would have to pay his union $100 a day for each day worked.   Of course, as the Court suggests, he might be able to defeat the union's attempt at judicial enforcement of the fine by showing it was "unreasonable" or that he was not a "full member" of the union, but few employees would have the courage or the financial means to be willing to take that risk.   Cf. *Ex parte Young,* 209 U. S. 123.

---

[2] See generally Comment, 115 U. Pa. L. Rev. 47 (1966); 80 Harv. L. Rev. 683 (1967).

The Court disposes of this tremendous practical difference between court-enforced and union-enforced fines by suggesting that Congress was not concerned with "the permissible *means* of enforcement of union fines" and that court-enforcement of fines is a necessary consequence of the "contract theory" of the union-member relationship. And then the Court cautions that its holding may only apply to court enforcement of "reasonable fines." Apparently the Court believes that these considerations somehow bring reasonable court-enforced fines within the ambit of "internal union affairs." There is no basis either historically or logically for this conclusion or the considerations upon which it is based. First, the Court says that disciplinary fines were commonplace at the time the Taft-Hartley Act was passed, and thus Congress could not have meant to prohibit these "traditional internal union discipline" measures without saying so. Yet there is not one word in the authorities cited by the Court that indicates that court enforcement of fines was commonplace or traditional in 1947, and, to the contrary, until recently unions rarely resorted to court enforcement of union fines.[3] Second, Congress' unfamiliarity in 1947 with this recent innovation and consequent failure to make any distinction between union-enforced and court-enforced fines cannot support the conclusion that Congress was unconcerned with the "means" a union uses to enforce its fines. Congress was expressly concerned with enacting "rules of the game" for unions to abide by. 93 Cong. Rec. 4436, II Leg. Hist. 1206. As noted by the Labor Board the year after § 8 (b)(1)(A)

---

[3] These authorities are cited at n. 9 of the Court's opinion. One of them notes that the union's "discipline power has its own practical limitations" simply because the union's ultimate sanction at that time was limited to expulsion. Summers, Disciplinary Powers of Unions, 3 Ind. & Lab. Rel. Rev. 483, 487 (1950). That practical limitation is today removed by the Court's holding.

was passed, "[i]n that Section, Congress was aiming at means, not at ends." *Perry Norvell Co.,* 80 N. L. R. B. 225, 239. At the very least Congress intended to preclude a union's use of certain means to collect fines. It is clear, as the Court recognizes, that Congress in enacting § 8 (b)(2) was concerned with insulating an employee's job from his union membership. If the union here had attempted to enforce the payment of the fines by persuading the employer to discharge the nonpaying employees or to withhold the fines from their wages, it would have clearly been guilty of an unfair labor practice under § 8(b)(2).[4] If the union here, operating under a union shop contract, had applied the employees' dues to the satisfaction of the fines and then charged them extra dues, that, under Board decisions, would have been a violation of § 8 (b)(1)(A), since it would have jeopardized the employees' jobs.[5] Yet here the union has resorted to equally effective outside assistance to enforce the payment of its fines, and the Court holds that within the ambit of "internal union discipline." I have already pointed to the impact that $100 per day court-enforced fines may have on an employee's job—they would totally discourage him from working at all—and I fail to see how court enforcement of union fines is any more "internal" than employer enforcement. The undeniable fact is that the union resorts to outside help when it is not strong enough to enforce obedience internally. And even if the union does not resort to outside help but uses threats of physical violence by its officers or other members to compel payment of its fines,

---

[4] See, *e. g., NLRB* v. *Bell Aircraft Corp.,* 206 F. 2d 235 (collective bargaining agreement between employer and union provided that employer could not promote employee who had disciplinary charges pending against him by union).

[5] See, *e. g., Associated Home Builders of Greater Green Bay,* 145 N. L. R. B. 1775, remanded on other grounds, 352 F. 2d 745.

I do not doubt that this too would be a violation of § 8 (b)(1)(A).

Finally, the Court attempts to justify court-enforcement of fines by comparing it to judicial enforcement of the provisions of an ordinary commercial contract—a comparison which, according to the Court's own authority, is simply "a legal fabrication."[6] The contractual theory of union membership, at least until recently, was a fiction used by the courts to justify judicial intervention in union affairs to protect employees, not to help unions. I cannot believe that Congress intended the effectiveness of § 8 (b)(1)(A) to be impaired by such a fiction,[7] or that it was content to rely on the state courts' use of this fiction to protect members from union coercion.[8] Particularly is that so where the "contract" between the union and the employee is the involuntary

---

[6] "The contract of membership is . . . a legal fabrication . . . . What are the terms of the contract? The constitutional provisions, particularly those governing discipline, are so notoriously vague that they fall far short of the certainty ordinarily required of a contract. The member has no choice as to terms but is compelled to adhere to the inflexible ones presented. Even then, the union is not bound, for it retains the unlimited power to amend any term at any time. . . . In short, membership is a special relationship. It is as far removed from the main channel of contract law as the relationships created by marriage . . . ." Summers, Legal Limitations on Union Discipline, 64 Harv. L. Rev. 1049, 1055–1056 (1951).

[7] Although the Court states that Congress was operating within the context of the "contract theory," I have been unable to find any reference to this theory in the legislative history, even by the opponents to curtailing union power. When Senator Pepper suggested that the section should not apply to union members because they elect their own leaders, Senator Taft rejected that premise as a frequent fiction. See p. 210, *infra*.

[8] Congress was, indeed, primarily concerned with the kind of coercion state courts were unable to cope with. 93 Cong. Rec. 4016, 4024, II Leg. Hist. 1018, 1031.

product of a union shop. Although the Court of Appeals held that to be the case here, the Court takes the surprising position that "what motivated" the full union member to make the "contract" is immaterial. I doubt that even an ordinary commercial contract is enforceable against a party who entered into it involuntarily. But I am certain that Congress did not intend to insulate union coercion from the literal language of § 8 (b)(1)(A) merely because the union has secured a "full" but involuntary contract from those it desires to coerce.

### III.

While the Court may be correct in saying that resort to legislative history is proper here, it is certainly not justified in ignoring the plain meaning of § 8 (b)(1)(A) on the basis of the inconclusive legislative history it points to. In the first place, "[w]hat legislative materials there are dealing with § 8 (b)(1)(A)" are only the remarks of a few Senators during the debate on the floor. The section was added on the floor after the bill had cleared the Senate Committee. There were no debates on the section in the House, there were no committee reports on the section, and debate in the Senate was brief. In the second place, though the Court deems the words "restrain or coerce" to be "imprecise," it somehow is willing to attribute a magical quality of clarity to the refrain "internal affairs of unions." The Court is thus willing to attribute more certainty and careful consideration to a refrain used by several Senators in a heated debate in response to certain criticism than it is to the words repeatedly used in the Act itself.

The repeated refrain of the debates on § 8 (b)(1)(A) was actually that it was aimed to secure "equality . . . between employers and employees." [9] Over and over

---

[9] 93 Cong. Rec. 4021, II Leg. Hist. 1025. See generally 93 Cong. Rec. 4432–4436, II Leg. Hist. 1199–1207.

again, Senator Taft and others emphasized that if a union indulges in conduct that would be an unfair labor practice on the part of an employer, it too should be guilty of an unfair labor practice.[10] Although the Court deems "this parallel . . . clearly . . . inapplicable to the relationship of a union member to his own union," it is clear that the sponsors of § 8 (b)(1)(A) did not think so. Several times, Senator Pepper tried to persuade Senator Taft that there was a difference between an employee's relation to his employer and his relation to his union. On each occasion, Senator Taft replied, "I cannot see any difference." 93 Cong. Rec. 4022, II Leg. Hist. 1026, 1027. When Senator Pepper asked whether the words "restrain or coerce" might have a different application to unions than to employers, Senator Taft replied:

> "The Board has been defining those words for 12 years, ever since it [the Act] came into existence. Its application to labor organizations may have a slightly different implication, but it seems to me perfectly clear that from the point of view of the employee the two cases are *parallel*. . . . If there is anything clear in the development of labor union history in the past 10 years it is that more and more *labor union employees* have come to be subject to the orders of labor union leaders. The bill provides for the right of protest against arbitrary powers which have been exercised by some of the labor union leaders. Certainly it seems to me that if we are willing to accept the principle that employees are entitled to the same protection against labor union leaders as against employers, then I can see no reasonable objection to the amendment . . . ." 93 Cong. Rec. 4023, II Leg. Hist. 1028. (Emphasis added.)

---

[10] 93 Cong. Rec. 4016, II Leg. Hist. 1018; 93 Cong. Rec. 4021, II Leg. Hist. 1025; 93 Cong. Rec. 4023, II Leg. Hist. 1028.

When Senator Pepper replied that Senator Taft was overlooking "the fact that the workers elect their own officers, whereas they do not elect their employers"— precisely the fact that the Court points to in finding the parallel between unions and employers inapplicable— Senator Taft replied:

"I think it is fair to say that in the case of many of the unions, the employee has a good deal more of an opportunity to select his employer than he has to select his labor-union leader; and even if he has that opportunity . . . the man who is elected may have been voted against by various of the employees who did not desire to have that particular man elected as the union leader. In such cases the very fact that they did vote against that man is often used later by the union as a means of coercing such employees, and *in some cases the union expels them from the union or subjects them to treatment which interferes with their rights as American citizens.*" 93 Cong. Rec. 4023, II Leg. Hist. 1028. (Emphasis added.)

And finally, when Senator Pepper charged that the "amendment is an effort to protect the workers against their own leaders," Senator Taft did not deny it.[11] He clearly stated that the bill was designed to warn unions "that they do not have the right to interfere with or coerce employees, either *their own members* or those outside their union." 93 Cong. Rec. 4025, II Leg. Hist. 1032. (Emphasis added.)

It is true that the Senate sponsors of § 8 (b)(1)(A) were primarily concerned with coercive organizational tactics of unions and that most of the examples of abuse referred to in the debates concerned threats of violence

---

[11] 93 Cong. Rec. 4023, II Leg. Hist. 1029. Senator Taft merely responded that the section protects nonunion employees as well as union members.

by unions against nonmember employees. But to say that § 8 (b)(1)(A) covers *only* coercive organizational tactics, which the Court comes very close to doing, is to ignore much of the legislative history. It is clear that § 8 (b)(1)(A) was intended to protect union as well as nonunion employees from coercive tactics of unions, and such protection would hardly be provided if the section applied only to organizational tactics. Also, it is clear that Congress was much more concerned with nonviolent economic coercion than with threats of physical violence. As Senator Ball, who introduced the section, put it: "But we are less concerned here with actual acts of violence than we are with threats . . . ." [12] And Senator Taft noted: "There are plenty of methods of coercion short of actual physical violence." [13] Examples were given of cases where unions threatened to double the dues of employees who waited until later to join.[14] It is difficult to see how fining a member is less coercive than doubling his dues, or how the one is "within the ambit of internal union affairs" and the other is not. After the bill was passed, in commenting on some of the abuses it was designed to correct, Senator Wiley said there are "instances in which unions . . . have imposed fines upon their members up to $20,000 because they crossed picket lines—dared to go to the place of employment." [15] Twice during the debate, Senator Taft emphatically stated that the section guarantees employees who wished to work during a strike the right to do so.[16] Though on neither occasion did he expressly

[12] 93 Cong. Rec. 4017, II Leg. Hist. 1020.

[13] 93 Cong. Rec. 4024, II Leg. Hist. 1031.

[14] 93 Cong. Rec. 4017, II Leg. Hist. 1020; 93 Cong. Rec. 4433, II Leg. Hist. 1200.

[15] 93 Cong. Rec. 5000, II Leg. Hist. 1471.

[16] See n. 1, *supra;* statement by Senator Taft quoted in n. 25 of the Court's opinion.

limit his examples to organizational strikes, the Court reads them as having such a limited reference.[17] Once again the Court utilizes ambiguous, extemporaneous legislative comments to circumvent the unambiguous language of a carefully drafted statute. Congress certainly knew how to limit expressly the applicability of the section to organizational coercion, if it intended to do so.[18]

The Court finds the strongest support for its position in statements of Senator Ball when he accepted the proviso proposed by Senator Holland. When Senator Holland observed, "Apparently it is not intended by the sponsors of the amendment to affect *at least that part of the internal administration* which has to do with the admission or the expulsion of members,"[19] Senator Ball replied, "It was never the intention of the sponsors of the pending amendment to interfere with the internal affairs or organization of unions."[20] From this statement by Senator Ball accepting the proviso the Court unjustifiably implies an intent to broaden it. First, there is no reason to suppose that Senator Ball was referring to any "part" of internal affairs other than that to which Senator Holland had referred. Second, the sponsors of the section repeatedly announced that it would protect union members from their leaders, and that protection would be impossible if the section did not to some extent interfere with the internal affairs of unions. As Senator Wiley said, "None of these provisions interferes *unduly* with union affairs, *except to the extent necessary to protect the individual rights of employees.*"[21] Third, the Court recognizes—without hold-

---

[17] See n. 25 of the Court's opinion.

[18] See, *e. g.,* § 8 (b) (4) (B).

[19] 93 Cong. Rec. 4271, II Leg. Hist. 1139 (emphasis added).

[20] 93 Cong. Rec. 4272, II Leg. Hist. 1141.

[21] 93 Cong. Rec. 5001, II Leg. Hist. 1472 (emphasis added).

ing—that the section may protect union members from "arbitrary" action of union leaders. However, it is difficult to understand how the arbitrariness or nonarbitrariness of a fine determines whether it is within the scope of "internal union affairs." [22]

What the Court does today is to write a new proviso to § 8 (b)(1)(A): "this paragraph shall not impair the right of a labor organization nonarbitrarily to restrain or coerce its members in their exercise of § 7 rights." Nothing in the legislative history supports the creation of this new proviso.

## IV.

The Court seeks further support for its holding by reference to the fact that the 1959 Landrum-Griffin

---

[22] The NLRB has itself recognized that a union "fine is by nature coercive." In *Local 138, Operating Engineers*, 148 N. L. R. B. 679, and *H. B. Roberts, Business Manager of Local 925, Operating Engineers*, 148 N. L. R. B. 674, enforced, 121 U. S. App. D. C. 297, 350 F. 2d 427, the Board held § 8 (b)(1)(A) prohibited a union from fining members who violated an internal union rule against filing charges with the NLRB. The Board concluded that "the imposition of a fine by a labor organization upon a member who files charges with the Board does restrain and coerce that member in the exercise of his right to file charges. The union's conduct is no less coercive where the filing of the charge is alleged to be in conflict with an internal union rule or policy and the fine is imposed allegedly to enforce that internal policy." *Local 138*, 148 N. L. R. B., at 682. In the present case, the Board distinguished *Local 138* and *Roberts* on the ground that the union rules involved there were "beyond the competence of the union to enforce" and were "not the legitimate concern of a union." 149 N. L. R. B. 67, 69. My Brother WHITE seems to take a similar position in resting his concurrence on the Court's holding that the union rule against crossing a picket line is "valid." But neither Congress' aim in § 8 (b)(1)(A) of proscribing certain means used to accomplish legitimate ends, nor the Court's view that Congress intended no interference with internal union affairs, would allow the application of the section to depend on the Board's or this Court's views of whether a particular internal union rule is "valid" or not.

amendments were "thought to be the first comprehensive regulation by Congress of the conduct of internal union affairs." And the Court thinks that to construe § 8 (b) (1)(A) according to its literal language to prohibit fines "is to say that Congress preceded the Landrum-Griffin amendments with an even more pervasive regulation of the internal affairs of unions."[23] But again the Court fails to distinguish between court-enforced fines and fines enforced by the traditional method of expulsion. Although both kinds of fines are coercive, I have already indicated that the proviso to § 8 (b)(1)(A) may preserve the union's right to impose fines which are enforceable only by expulsion and that expulsion was the common mode of enforcing fines at the time the section was adopted. If one assumes that the only fines prohibited by the section are court-enforced fines, then the section was not a pervasive regulation of union internal affairs. If court enforcement of fines is within the ambit of internal union affairs, which I doubt, then those affairs were only incidentally regulated by a flat prohibition of this seldom-used method of union discipline. If the common forms of union discipline—expulsion and fines enforceable by expulsion—were not prohibited or regulated by Taft-Hartley, then Landrum-Griffin was indeed the first comprehensive regulation of them.

## V.

The union here had a union security clause in its contract with Allis-Chalmers. That clause made it necessary

---

[23] Although the Landrum-Griffin Act might be resorted to for the purpose of determining the limits of "vague language" in the Taft-Hartley Act, it should not be used, as the Court here uses it, to deprive employees of rights unequivocally granted them by the earlier Act. Section 103 of the Landrum-Griffin Act, 73 Stat. 523 (1959), 29 U. S. C. § 413, expressly provides: "Nothing contained in this title shall limit the rights and remedies of any member of a labor organization under any . . . Federal law . . . ."

for all employees, including the ones involved here, to pay dues and fees to the union. But § 8 (a)(3) and § 8 (b)(2) make it clear that "Congress intended to prevent utilization of union security agreements for any purpose other than to compel payment of union dues and fees." *Radio Officers' Union* v. *Labor Board,* 347 U. S. 17, 41. If the union uses the union security clause to compel employees to pay dues, characterizes such employees as members, and then uses such membership as a basis for imposing court-enforced fines upon those employees unwilling to participate in a union strike, then the union security clause is being used for a purpose other than "to compel payment of union dues and fees." It is being used to coerce employees to join in union activity in violation of § 8 (b)(2).

The Court suggests that this problem is not present here, because the fined employees failed to prove they enjoyed other than full union membership, that their role in the union was not in fact limited to the obligation of paying dues. For several reasons, I am unable to agree with the Court's approach. Few employees forced to become "members" of the union by virtue of the union security clause will be aware of the fact that they must somehow "limit" their membership to avoid the union's court-enforced fines. Even those who are brash enough to attempt to do so may be unfamiliar with how to do it. Must they refrain from doing anything but paying dues, or will signing the routine union pledge still leave them with less than full membership? And finally, it is clear that what restrains the employee from going to work during a union strike is the union's threat that it will fine him and collect the fine from him in court. How many employees in a union shop whose names appear on the union's membership rolls will be willing to ignore that threat in the hope that they will later be able to convince the Labor Board or

the state court that they were not full members of the union? By refusing to decide whether § 8 (b)(1)(A) prohibits the union from fining an employee who does nothing more than pay union dues as a condition to retaining his job in a union shop, the Court adds coercive impetus to the union's threat of fines. Today's decision makes it highly dangerous for an employee in a union shop to exercise his § 7 right to refrain from participating in a strike called by a union in which he is a member in name only.

## VI.

The National Labor Relations Act, as originally passed and amended from time to time, is the work product of draftsmen skilled by long experience in labor affairs. These draftsmen thoroughly understood labor legislation terminology, especially the oft-used words "restrain or coerce." Sections 7 and 8 together bespeak a strong purpose of Congress to leave workers wholly free to determine in what concerted labor activities they will engage or decline to engage. This freedom of workers to go their own way in this field, completely unhampered by pressures of employers or unions, is and always has been a basic purpose of the labor legislation now under consideration. In my judgment it ill behooves this Court to strike so diligently to defeat this unequivocally declared purpose of Congress, merely because the Court believes that too much freedom of choice for workers will impair the effective power of unions. Cf. *Vaca* v. *Sipes,* 386 U. S. 171, 203 (dissenting opinion). A court-enforced fine is certainly coercive, certainly affects the employee's job, and certainly is not a traditional method of internal union discipline. When applied by a union to an employee who has joined it as a condition of obtaining employment in a union shop, it defeats the provisions of the Act designed to prevent union security clauses

from being used for purposes other than to compel payment of dues. In such a situation it cannot be justified on any theory that the employee has contracted away or waived his § 7 rights.

Where there is clear legislative history to justify it, courts often decline to follow the literal meaning of a statute. But this practice is fraught with dangers when the legislative history is at best brief, inconclusive, and ambiguous. This is precisely such a case, and I dissent because I am convinced that the Court has ignored the literal language of § 8 (b)(1)(A) in order to give unions a power which the Court, but not Congress, thinks they need.