JOHN L. LASCARIS, as Commissioner of Social Services of Onondaga County, Respondent, v. GEORGE K. WYMAN, Individually and as Commissioner of Social Services of the State of New York, Appellant. CHARLES BUGNACKI et al., Intervenors-Appellants.

Fourth Department, January 20, 1972.

*Louis J. Lefkowitz, Attorney-General (Sidney L. Grossman, Ruth Kessler Toch* and *Harvey R. Lasner* of counsel), for appellant.

*Blitman & King (Bernard T. King* of counsel), for intervenors-appellants.

*Philip Pinsky (Leonard C. Koldin* of counsel), for respondent.

*Lipsitz, Green, Fahringer, Roll, Schuller & James (Carmen Putrino* of counsel), for Communication Workers of America, *amicus curiae.*

*Bond, Schoeneck & King* for Chamber of Commerce of United States, *amicus curiae.*

CARDAMONE, J.   We are asked to review a determination made at Special Term that denied strikers the right to receive welfare benefits.   We believe that determination should be reversed because the law so provides.   Welfare assistance will only be granted to those strikers who are in need; and in the absence of a very lengthy strike, welfare benefits will generally be needed only during the first seven weeks of a strike, after which unemployment insurance benefits would be payable to the strikers (Labor Law, § 592, subd. 1; Social Services Law, § 131-a).

The pertinent facts are not in dispute.   The plaintiff, John Lascaris, Commissioner of Social Services of Onondaga County, commenced a declaratory judgment action after members of the Communications Workers of America (CWA), including members of Locals 1123, 1152, 1191, and 1197 of the Greater Syracuse Labor Council, went on strike on July 14, 1971.   He sought a declaration that section 131 of the Social Services Law precludes striking union employees[1] from receiving public assistance.   The defendant, George K. Wyman, Commissioner of Social Services, has determined, on the contrary, that welfare assistance shall be granted to those unable to maintain themselves where the applicant stays away from work because he is a member of a union on strike.   Charles Bugnacki, Earl Auslander, and Thomas Gentile were permitted to intervene, individually and on behalf

---

1. The rights of the strikers' wives and children are not at issue.   The record reveals that those dependents who are entitled thereto are receiving public assistance.

of all other members of Locals 1123, 1152, 1191, and 1197, as party defendants.

The plaintiff, Onondaga County Commissioner of Social Services, and the defendant, State Commissioner, both moved for summary judgment in the declaratory judgment action. Special Term denied the defendant's motion, and in granting plaintiff's motion decreed that the individual defendant-intervenors and all others similarly situated were not entitled to public assistance and directed plaintiff not to furnish the same, and further ordered the defendant State Commissioner to continue State and Federal contributions to the County Commissioner without regard to plaintiff's denial of public assistance to defendant-intervenors and others similarly situated.

It is from this determination that defendant State Commissioner and the defendants-intervenors appeal.

Since only a question of law was presented, the awarding of summary judgment was appropriate. However, while there is a dearth of case law and no statute which by its express terms controls the issue before us, we hold that summary judgment granted by Special Term to the plaintiff should, instead, have been awarded to the defendant State Commissioner. A review of the legislative history of section 131 of the Social Services Law leads inescapably to this conclusion. Subdivision 1 of that section expresses the purpose of welfare assistance in this State: "It shall be the duty of social services officials * * * to provide adequately for those unable to maintain themselves * * * and shall further give such service to those liable to become destitute as may prevent the necessity of their becoming public charges." Subdivision 4 was added in 1959 (L. 1959, ch. 715) to provide that assistance shall not be given to an *employable* person who has not registered with the nearest employment office of the Department of Labor, or who has refused to accept employment for which he is fitted and able to accept. This subdivision was amended in 1969 (L. 1969, ch. 184, § 4) by the addition of four paragraphs which enumerated certain actions which were deemed to constitute refusal to accept employment.[2]

---

2. "A person shall be deemed to have refused to accept such employment if he: a. fails to obtain and file with the social services district at least once in every two-week period a new certificate from the appropriate local employment office of the state department of labor stating that such employment office has no order for an opening in part-time, full-time, temporary or permanent employment in which the applicant is able to engage, or b. wilfully fails to report for an interview at an employment office with respect to employment when requested to do so by such office, or c. wilfully fails to report to such office the result of a referral to employment, or d. wilfully fails to report for employment."

Following the 1969 amendment, plaintiff commenced an action to obtain a determination of the same issues presently before us. Special Term of Onondaga County (O'DONNELL, J.) concluded that striking employees were entitled to welfare benefits (*Lascaris* v. *Wyman*, 61 Misc 2d 212). No appeal was taken from that determination.

Under the statute in 1969 the issue was whether a striker was an " employable person "; and as a further issue, whether his refusal to work for his employer during a strike constituted a " refusal " to accept employment within the meaning of subdivision 4 of section 131.

It is obvious that a striker is an " employable individual " at least for the duration of the strike. Of course, if a striking worker refuses to accept employment, then public assistance should be denied (Social Services Law, § 131, subd. 4, par. d) in *Matter of Martinez* (decision of Commissioner of Social Services, dated Aug. 3, 1971).

The other issue is whether a striking union member's refusal to work for his employer during the strike constitutes a refusal to accept employment as envisioned by subdivision 4 of section 131. Since the Supreme Court has held that a union may impose fines, with the implicit threat of expulsion, upon union members who decline to honor an authorized strike (*NLRB* v. *Allis-Chalmers Mfg. Co.*, 388 U. S. 175, 178-195), a refusal by a union member to work for his employer during the continuance of a strike can hardly be viewed as a " voluntary act ". We do not believe the Legislature could have intended that such a refusal by a striker to work for his employer would serve as the basis for denial of public assistance. To so hold would subject union employees to union sanctions if they refused to obey strike orders and denial of welfare benefits if they did, and would thus be tantamount to a denial to them of their right to strike guaranteed them under Federal[3] and State law (U. S. Code, tit. 29, §§ 157, 163; Labor Law, § 713).

Some further insight into the legislative intent may be gleaned by an examination of the statutory provisions respecting unemployment compensation. There the Legislature provides that " no refusal to accept employment shall be deemed without good

3. Congress has not passed any legislation which expressly grants or denies Federally funded assistance to strikers. However, last June an amendment to a Department of Agriculture appropriation bill which would have made food stamps unavailable to any household " which needs assistance solely because any member of such household is a participant in * * * [a] strike ", was debated and defeated in the House of Representatives by a vote of 172 [for] to 225 [against], 117 Cong. Rec. H 5805-5810 (daily ed. June 23, 1971).

cause nor shall it disqualify any claimant otherwise eligible to receive benefits if there is a strike, lockout, or other industrial controversy in the establishment in which the employment is offered ''. (Labor Law, § 593, subd. 2, par. [b].)

While it would appear that a majority of the States permit welfare payments to strikers,[4] only two cases have considered the legality of such practice, both of which upheld the policy of granting welfare to strikers in the states of Illinois and Massachusetts (*Strato-O-Seal Mfg. Co.* v. *Scott,* 72 Ill. App. 2d 480; *ITT Lamp Div. of Int. Tel. & Tel. Corp.* v. *Minter,* 435 F. 2d 989, cert. den. 402 U. S. 933). Indeed, as the Attorney-General argues, it has been the administrative policy of the defendant State Commissioner to pay welfare benefits to striking workers in 11 major strikes[5] in this State over a period of the past 20 years.

Thus, we conclude that immediately prior to the 1971 amendment to subdivision 4 of section 131 of the Social Services Law, strikers were eligible to receive public assistance provided that they registered with the State employment office and did not refuse any new employment opportunities.

In 1971 subdivision 4 of section 131 was amended (L. 1971, ch. 298, § 5, eff. May 24, 1971) by the addition of a number of sentences.[6] It is clear from a reading of the added language that it merely designated certain classes of people as being not

---

4. "Strikers on Welfare: Workers on Public Aid During Walkouts Draw Increasing Criticism", *Wall Street Journal,* July 14, 1971 at 1, 10. This article reports that during the 101-day strike against G.E. in 1969-70, only 3 of the 33 States in which G.E. operates showed "any disposition to bar strikers from collecting state welfare aid."

5. 1952 "Lyon Mountain" strike (Clinton County); 1955 "N. Y. Airbrake Co." strike (Jefferson County); 1956 "Operating Engineers" strike (St. Lawrence County), "Federal Bearing" strike (Dutchess County), "National Cash Register" strike (Cayuga County), "West Virginia Pulp & Paper Co." strike (Saratoga and Rensselaer Counties); 1957 "Barnett Slipper & Sky Dryne Co." strikes (Orange County); 1956-59, Statewide "Steel Strikes", e.g. Bethlehem Steel; 1961 "R. T. French Co." strike (Monroe County); 1966 "General Electric Co." strike (Schenectady County); 1969 "Crouse Hinds Co." strike (Onondaga County).

6. "a person shall be deemed employable if such person is not rendered unable to work by: illness or significant and substantial incapacitation, either mental or physical, to the extent and of such duration that such illness or incapacitation prevents such person from performing services; advanced age; full-time attendance at school in the case of [a] minor, in accordance with provisions of this chapter; full-time, satisfactory participation in an approved program of vocational training or rehabilitation; the need of such person to provide full-time care for other members of such person's household who are wholly incapacitated, or who are children, and for whom required care is not otherwise reasonably available, notwithstanding diligent efforts by such person and the appropriate social services department to obtain others to provide such care."

deemed " employable ", i.e., it enumerated those who are " unemployable " for such reasons as illness or incapacitation, either physical or mental, or advanced age. It was the obvious purpose of this amendment to remove those designated by the added language from the status of an " employable person ", and thus exempt them (because of the hardship involved) from the requirement of registering with the local department of labor office in order to be entitled to public assistance. The 1971 amendment made no change with respect to " employable persons ". Since strikers were and are " employable persons " under the statute, the amendment to subdivision 4 of section 131 of the Social Services Law does not affect their rights to receive welfare. The Legislature was again silent as to the rights of employees to receive benefits while on strike. But it seems hardly conceivable that it was unaware of the long standing administrative policy of the State Department of Social Services holding strikers eligible for public assistance. Under these circumstances we conclude that the Legislature did not eliminate strikers from entitlement to public assistance by failing to include them in the category of those deemed " unemployable "; nor may its silence on this subject be reasonably construed to indicate a legislative intent to change administrative policy extant for 20 years. Rather, it seems more reasonable to conclude that the Legislature is satisfied with the law as it has been and is presently administered.

Several other issues remain to be considered. The plaintiff urges that granting welfare assistance to strikers would violate the State's policy, as evidenced by the Unemployment Insurance Law, to remain neutral in industrial controversies. Clearly, however, unemployment compensation and welfare assistance serve different purposes. Public assistance is designed to supply unmet subsistence needs while unemployment compensation is designed to cushion the shock of seasonal, cyclical, or technological unemployment without reference to demonstrated needs. (*ITT Lamp Div.* v. *Minter, supra,* p. 994.) It should be noted that we are here dealing only with a subsistence level of living and *not* a replacement of a striker's wages. It further appears that while payment of these benefits may support workers and foster strikes, by the same token its denial supports employers, encourages lockouts, and discourages strikes. Accordingly, the so-called " neutrality " argument is entitled to little weight. More persuasive in this determination is the broad humanitarian policy clearly enunciated by the Legislature in section 131 of the Social Services Law.

The last two contentions of plaintiff are that Federal preemption in the field of collective bargaining mandates neutrality by the States, and that the granting of welfare benefits to strikers would intrude upon the Federal scheme; and that the strike in the instant matter was unauthorized and illegal because it violated a no-strike clause. With respect to the former, we believe the First Circuit Court of Appeals (the only Federal court to consider this issue) correctly concluded that it was doubtful that the granting of benefits to strikers would effect "a significant frustration of federal collective bargaining policy" and that, in view of the State's substantial police power it should not be assumed that Congress intended to deprive the State of the power to serve its interests to promote public welfare (*ITT Lamp Div.* v. *Minter, supra,* pp. 992–994, cert. den. 402 U. S. 933, *supra*). With respect to the final issue, our Court of Appeals has recognized that it is not appropriate or wise for a social welfare agency to inquire into the legality of a strike, but suggests that the question of "fault" in work stoppage is best left to Federal and State Labor Boards especially qualified to deal with them (*Matter of Heitzenrater [Hooker Chem. Corp.],* 19 N Y 2d 1, 7).

The order should be reversed and judgment declared in favor of defendant-appellant Commissioner of Social Services of the State of New York.

MARSH, J. P., WITMER, MOULE and HENRY, JJ., concur.

Judgment unanimously reversed on the law and facts without costs and judgment declared in favor of defendant-appellant Commissioner of Social Services of the State of New York in accordance with the opinion by CARDAMONE, J.