CORBESCO, INC., a corporation, and
Robert R. Sturm, an individual,
Plaintiffs,

v.

LOCAL NO. 542, INTERNATIONAL UNION OF OPERATING ENGINEERS, an
unincorporated association, Defendant.

Civ. A. No. 83–180–JLL.

United States District Court,
D. Delaware.

Oct. 22, 1985.

Stanley William Balick, Wilmington, Del., and Peter R. Spanos and Dudley C. Rochelle of Summers, Hendrick, Spanos & Phillips, Atlanta, Ga., of counsel, for plaintiffs.

Robert Jacobs of Jacobs & Crumplar, P.A., Wilmington, Del., and Robert Tim Brown of Kirschner, Walters, Willig, Weinberg & Dempsey, Philadelphia, Pa., of counsel, for defendant.

OPINION

LATCHUM, Senior District Judge.

Plaintiff, Corbesco, Inc. ("Corbesco"), a corporation organized under the laws of the State of Louisiana with its principal place of business in that state, and Robert R. Sturm ("Sturm") filed a complaint on March 30, 1983, against the defendant in this case, Local No. 542, International Union of Operating Engineers ("Local 542"), alleging violation of sections 8(b)(4)(D) and 303 of the Labor-Management Relations Act, 29 U.S.C. §§ 158(b)(4)(D), 187, seeking damages resulting to Corbesco in its business and personal injuries to Sturm, intentional interference with Corbesco's collective bargaining agreement, and various state law tort claims.[1] The parties reached

---

1. Jurisdiction exists by virtue of 29 U.S.C. §§ 185, 187 of the Labor-Management Relations Act, and venue is properly laid under 29 U.S.C. § 185(c) and 28 U.S.C. § 1391(b). The defend-

agreement on the terms of a settlement, which was reflected in a letter written by plaintiffs' counsel on May 30, 1985. Plaintiffs' counsel subsequently drafted a detailed Settlement Agreement, the terms of which the defendant later claimed differ from those in the letter of May 30. The defendant by letter (Docket Item ["D.I."] 32) informed the Court that due to rejection of the agreement [2] by the Executive Council of the defendant Local 542, no settlement in fact had been reached. The plaintiffs have moved to enforce the agreement to settle and to enter judgment thereon. (D.I. 33.) Pursuant to 29 U.S.C. §§ 101, 107 and *United Telegraph Workers, AFL–CIO et al. v. Western Union Corp.*, 771 F.2d 699 (3d Cir.1985) the Court on September 9, 1985, ordered an evidentiary hearing for the benefit of the defendant (D.I. 41), which the defendant has specifically waived (D.I. 42). Thus, again before this Court, after another flurry of briefing by the parties, is plaintiffs' motion to enforce the agreement to settle and enter judgment.[3]

Sitting in equity, the Court decides this case without a jury upon consideration of the entire record, all documents, affidavits, and legal memoranda submitted by the plaintiffs and the defendant, and enters the following findings of fact and conclusions of law which are embodied in this opinion as permitted by Rule 52(a), Fed.R.Civ.P.

## I. THE FACTS

Because this Court has before it only the narrow issue of the enforceability of an agreement allegedly reached during settlement negotiations between the parties, the events which resulted in the litigation will be only briefly recounted.

Corbesco was a subcontractor on a construction project for Getty Oil Company.

The project was located approximately twelve miles from Wilmington, Delaware. (D.I. 1, ¶ 11.) Corbesco entered into a subcontract agreement with Henkels & McCoy, Inc., the main contractor for a certain portion of the project. (*Id.* at ¶ 12.)

A piece of equipment called a "modified hand crab winch" was required to raise siding panels to the scaffolding for installation by Corbesco employees. (D.I. 1, ¶ 13.) The Corbesco employees who were installing these siding panels by means of the crab winch were covered by a collective bargaining agreement between Corbesco and Local Union No. 626, United Brotherhood of Carpenters and Joiners of America ("Local 626"). (*Id.* at ¶ 14.) For a period of about two weeks, beginning approximately on January 4, 1983, the members of Local 542 began to intimidate members of Local 626 working for Corbesco. The actions began with threats, but ended with personal injuries to the individual plaintiff, Sturm, and destruction of property, including the crab winch, such that work on the project was substantially delayed. (D.I. 18, 61–158).

During and after the discovery phase of this case, all of the parties pursued settlement negotiations which resulted in a formal offer of settlement made by the defendant on October 16, 1984. (D.I. 20, ¶ 3.) Tim Brown, counsel for the defendant, told Dudley C. Rochelle, counsel for plaintiffs, that he had been authorized by Local 542 to make an offer of $25,000, to be paid in two installments, "to set negotiations in motion," a commitment by the defendant to allow Corbesco to use the crab winch, and a confidentiality agreement by Corbesco and Sturm not to advertise the settlement. (D.I. 35, ¶ 9.) On November 28, 1984,

ant, Local 542, is engaged in representing and acting for employee members within the District of Delaware, and the acts which are the basis of the claims arose in this district.

**2.** Hereinafter, "agreement" refers to the initial oral settlement agreement incorporated into the May 30 letter, and "Settlement Agreement" refers to the Settlement Agreement unilaterally drawn up subsequently by the plaintiffs.

**3.** In Defendant's Opposition to Motion to enforce the agreement to settle and enter judgment (D.I. 38), defendant urges the Court to enforce the agreement "as actually agreed upon between plaintiffs and defendant," as opposed to the Settlement Agreement drafted by the plaintiffs in the event the Court finds a valid, enforceable agreement.

Brown transmitted plaintiffs' counteroffer of $50,000, payable in two equal installments over a two-year period with interest, with security or co-signature by the defendant-union. Brown stated that he felt they were "still in the ballpark" and would get back to Rochelle in two or three days after talking to his client. (*Id.* at ¶ 11.)

On April 4, 1985, Brown called Rochelle to report on the results of a meeting with John Kirschner of Brown's law firm, John Arnone, Business Agent for Local 542, other representatives of Local 542, and Brown himself. Brown stated that the previous offer of the defendant of $25,000 was still open but that there was yet no definite response to plaintiffs' offer of $50,000. (D.I. 35, ¶ 14.) Brown called Rochelle again on April 12 to inform her that Ed Foy, Local 542's general counsel, would join the settlement negotiations. Foy then called Rochelle the same day to discuss various matters concerning the settlement. Brown called Rochelle again on April 25 to report that both he and Foy were hopeful that the matter would be settled. Rochelle responded that plaintiffs were still waiting for a counteroffer by the union. (*Id.* at ¶¶ 17–18.) Brown then called Rochelle on May 7 to set up a conference call with Foy to make a "slightly higher offer." During the conference call, in which Brown, Foy, Rochelle, and Peter Spanos, another attorney for the plaintiffs, participated, Brown and Foy communicated the defendant's proposal to settle the case for $30,000, with two equal installments. (*Id.* at ¶ 19.) On May 14, Rochelle called Brown and made a counteroffer of $40,000 on behalf of the plaintiffs. (*Id.* at ¶ 20.)

On May 23, Brown called Rochelle with another offer from Local 542, which would eventually form the basis of the agreement to settle, of a total payment of $35,000, with $20,000 payable within sixty days of the settlement and $15,000 payable one year later, backed up by a security interest in a building owned by the defendant. Local 542 agreed to issue a letter disclaiming jurisdiction over the work of operating the crab winch for eight years within the State of Delaware. (D.I. 35, ¶ 21.) Rochelle

called Brown on May 28 with a counteroffer of $37,500 with an initial payment of $20,000 and $17,500 payable one year later with security. She stated that the $2500 above the defendant's offer represented interest on the later installment. Plaintiffs also requested a disclaimer by the union concerning the winch for fifteen years, and notification of the settlement to the union but would agree to some plan concerning confidentiality. (*Id.* at ¶ 23.) Brown called Rochelle the next day to report that his client would not budge from its previous offer of $35,000, $20,000 initial payment within sixty days, and $15,000 one year later and that it would not extend the disclaimer beyond eight years. During the same discussion, Brown stated that Foy had confirmed to him earlier that day that the union's last offer of $35,000 was still open. (*Id.* at ¶¶ 24–25.)

Rochelle in her affidavit stated that throughout the settlement negotiations she understood that Local 542's counsel was acting with Local 542's authority, "as he (Brown) so stated." In fact, Brown "often referred specifically to having conferred with and received instructions from Business Agent John Arnone." (*Id.* at ¶ 26.)

Rochelle called on May 30 to confirm plaintiffs' acceptance of Local 542's offer of $35,000. She also sent a letter the same day to the defendant giving the details of the negotiated agreement. (D.I., 33, Ex. J.) The terms stated in this letter restated those agreed to over the telephone. The essential terms required the defendant union to do the following: (1) to pay total damages to Corbesco and Sturm of $35,000, with $20,000 to be paid within sixty days of execution of the settlement and $15,000 payable one year after execution of the settlement; (2) to deliver a first mortgage on an office building in New Castle, Delaware, which the union owned free and clear, sufficient to secure the latter installment; (3) to issue a written disclaimer of jurisdiction over operation of Corbesco's crab winch, so described as to allow some improvements or modifications but to exclude "tugger winch work," for a period of

eight years in the State of Delaware; and (4) to post a notice at the union hiring hall, similar to the type required by the NLRB in settlement agreements, for sixty days, the standard NLRB period, stating that the union would not inhibit others from assigning work to employees in a particular trade.[4] For its part, Corbesco and Sturm agreed not to "take the initiative in publicizing or disseminating information about the outcome of this lawsuit to the construction industry or the public at large."[5] In the letter, the plaintiffs stated their understanding of the defendant's difficulty in financing a certain property, which explains their agreeing to a delay of the first installment for sixty days.[6]

Rochelle did not receive any communication from either Brown or Foy concerning her May 30 letter. (D.I. 35, ¶ 28.) Rochelle called Brown on June 7. Brown told her that he had talked to Foy who agreed that the May 30 letter seemed to be "in line with Local 542's offer and that either he or Foy had spoken to business manager Arnone." Brown stated that he assumed the details of the settlement agreement would be acceptable to the client although he had no official response from it. (*Id.* at ¶ 29.)

On June 14 Rochelle sent Brown a written Settlement Agreement, drafted by the plaintiffs. (D.I. 35, ¶ 31.) Rochelle stated that neither Brown, Foy, nor any other representative of the defendant on either May 30, June 2, June 7, or June 14 informed her that the last settlement offer of $35,000 made by the defendant was subject to further approval by its Executive Board. (*Id.* at ¶ 32.) It was only on June 27, when Rochelle called Brown, that Brown informed her for the first time that the Executive Board had yet to approve the settlement. (*Id.* at ¶ 33.) On June 28, Brown called Rochelle and stated that the Executive Board had voted to "reject the settlement." (*Id.* at ¶ 34.)

## II. ANALYSIS

The issues facing the Court are narrow and easily defined: (1) whether a binding, enforceable agreement to settle was created by legal counsel acting on behalf and under the authority of the defendant labor union, when the Executive Board of the union later revoked its vote in favor of the agreement; and (2) whether the Settlement Agreement, drawn up by the plaintiffs' counsel, may be enforced. If the Court finds that an agreement was made, but that it cannot enforce the Settlement Agreement, it must determine the basis of the agreement to settle that was actually made.

### A. *Agreement Between Counsel for Defendant and Plaintiffs.*

■ A district court has jurisdiction to enforce a settlement agreement entered

---

**4.** In this part of the agreement, which substantially followed the language of 29 U.S.C. § 158(b)(4)(D), the letter of May 30 required the notice to state that Local 542 "will not engage in, induce or encourage any individual to engage in, a strike or refusal in the course of his employment to use, manufacture, process, transport, or otherwise handle or work on any goods, articles, materials, or commodities or to perform any services or to threaten, coerce, or restrain any person engaged in commerce or in an industry affecting commerce, where in either case an object thereof is forcing or requiring any employer to assign particular work to employees in a particular labor organization or in a particular trade, craft, or class rather than to employees in another trade, craft, or class." (D.I. 33, Ex. J at 1–2.)

**5.** In this part of the agreement, however, the principals of Corbesco and Sturm were allowed to "truthfully answer any unsolicited direct inquiries" concerning the case. Corbesco's and Sturm's counsel also agreed not to share discovery material with other attorneys or parties. (D.I. 33, Ex. J at 2.)

**6.** Payment would be made by one of the following methods: (1) payment of the $20,000 on or before the expiration of sixty days, together with delivery of the first mortgage, and judgment entered requiring payment of $15,000 on or before the end of one year after the end of the first sixty-day period; or (2) payment of the entire amount of $35,000 on or before the expiration of the sixty-day period, and entry of judgment of dismissal. Payment would be made by certified or cashier's check. The letter stated that the settlement agreement would state that default on any installment would authorize immediate entry of judgment for the full amount plus legal interest. (D.I. 33, Ex. J at 2–3.)

into by litigants in a case pending before it. *Hobbs v. American Investors Management, Inc.*, 576 F.2d 29 (3d Cir.1978); *Read v. Baker*, 438 F.Supp. 732 (D.Del.1977).

Delaware law, which is controlling in this case, is well established concerning the circumstances under which a settlement agreement must be enforced. "[A]n attorney of record in a pending action who agrees to a compromise of a case is presumed to have lawful authority to make such an agreement," *Read v. Baker*, 438 F.Supp. 732 (D.Del.1977) (citing *Aiken v. National Fire Safety Counsellors*, 36 Del.Ch. 136, 127 A.2d 473, 475 (1956); *Strattner v. Wilmington City Electric Co.*, 3 Pennewill 453, 53 A. 436, 437 (Del. Supr.1901)), and the burden is then on the client to rebut that presumption. *Aiken*, 127 A.2d at 475. Compromising a client's claim or case is an action of fundamental importance, and the courts distinguish it from other actions of counsel in a pending litigation. An attorney generally enjoys a broad grant of authority within which to act for his client in order to promote order and efficiency in the presentation and conclusion of litigation, *Trans World Airlines, Inc. v. Summa Corp.*, 394 A.2d 241 (Del. Ch.1978), but does not have implied or apparent authority to compromise an action solely on the basis of being retained as counsel in the matter. *Id.; Aiken*, 127 A.2d at 475.

The essential circumstances in which the settlement negotiations were conducted, most clearly elaborated in the plaintiffs' affidavit of Dudley Rochelle, counsel for Corbesco and Sturm, are uncontradicted by the defendant. The legal memoranda and letters to this Court by the defendant serve only to demonstrate that the defendant's counsel presented the defendant's offer of $35,000, which was duly accepted.[7] (D.I. 39, 2.)

Thus, the defendant must introduce evidence to show that Brown did not have lawful authority to enter this agreement. Defendant attempts to rebut the presumption of lawful authority by pointing to certain facts concerning the "democratic nature" of the union's Executive Board which made consensus difficult (D.I. 32, ¶ 4), and to statements made to plaintiffs' counsel that there was a delay in getting agreement authorized by the union. (*Id.* at ¶ 5.) The defendant claims that plaintiffs' counsel was aware of the difficulty of the defendant's Executive Board in obtaining a consensus on a settlement offer. (D.I. 32, 2; D.I. 39, 2.) Such statements are insufficient to rebut the presumption of legal authority, particularly because Brown admits that he told Rochelle, plaintiffs' counsel, that the offer had been assented to, thus indicating that the difficulty in obtaining consent had been overcome.[8] Moreover, Brown repeatedly told Rochelle that he conferred with and received instructions from his client to determine whether a given offer was acceptable to it. (D.I. 35, ¶ 26.)[9] Counsel for the defendant also concedes that it made various representations to the plaintiffs that it had authority to negotiate a settlement.[10] These facts suffi-

---

**7.** In a letter to the Court, defendant admitted that counsel for both sides thought an agreement had been reached. (D.I. 32, 2.) In his affidavit, Brown stated, "I cannot, under the circumstances, state that there was not 'a meeting of the minds' in the course of these settlement negotiations, insofar as the settlement negotiation covered the matter in dispute." (D.I. 38, ¶ 9.)

**8.** In his affidavit, Brown implied that the Executive Board had initially agreed to the final offer, but subsequently changed its mind: "Rather, what has occurred is that the Union's Executive Board debated the issue further, and that debate resulted in a *change of votes* and a consequent 'rejection' of the settlement, as set forth in Attor-

ney Rochelle's Affidavit." (D.I. 38, ¶ 8) (emphasis added).

**9.** Rochelle stated that John Arnone, Business Agent for the union, was the individual from the union with whom Brown would confer. (D.I. 35, ¶ 26.) In fact, according to Brown, it was Arnone who "governed" the activities of the union in conjunction with the Executive Board. (D.I. 38, ¶ 3.)

**10.** In his affidavit, Brown admits that he was authorized to act for defendant in the settlement negotiations, while continually informing Rochelle of the difficulty of achieving consensus by the Executive Board. (D.I. 38, ¶ 5.)

ciently dispel any questions concerning "agency" alluded to by defendant. (D.I. 39, 4.) There is no evidence in the record to suggest that the union revoked the authority to make a settlement before it was accepted, or in some way conditioned this authority.

There is also no doubt that a binding contract was formed by Brown's oral agreement to settle for $35,000. Although at the time there was no formal offer nor acceptance, the negotiations, like those in *Main Line Theatres, Inc. v. Paramount Film Distrib. Corp.*, 298 F.2d 801, 802 n. 1, had reached the point where mutual assent had been expressed to settle. Defendant's counsel agree that plaintiffs' letter of May 30 accurately reflects the terms orally agreed upon. (D.I. 38, ¶ 6.)

Defendant argues against enforcement also because the case involves issues "far more complex" than a simple settlement. (D.I. 39, 4.) This bare statement cites nothing in support; the simple fact of the matter is that the focal point of the settlement negotiations was a money judgment, and the details concerned the manner in which the financially straightened union would effect this payment.[11]

### B. The Settlement Agreement.

■ Although the defendant admits that offer and acceptance occurred during settlement negotiations, it contests the plaintiffs' claim that the written, detailed Settlement Agreement submitted later by plaintiffs constitutes the written reflection of the terms actually agreed upon by the parties. (D.I. 39, 2.)

The Court does not find the Settlement Agreement unilaterally drawn up by plaintiffs' counsel to serve as an appropriate basis for an order enforcing the agreement which indisputably occurred between the parties. Defendant does not dispute that the terms in the letter to defendant of May 30 (the specific terms of which are outlined under the "Facts" above) were discussed and agreed upon; it does contend that the Settlement Agreement, drafted unilaterally by plaintiffs' counsel, "includes many details never discussed by the parties." (D.I. 38, ¶ 7.) Although the plaintiffs correctly assert that an agreement was reached, they have not produced any evidence that the specific terms of the proposed, written Settlement Agreement were assented to, much less discussed, by the defendant. Plaintiffs only argue that "Even though every minor detail of the Settlement Agreement was not spelled out in Plaintiffs' counsels' letters of May 30 and June 7, the terms set forth ... are reasonable and in accordance with the letters to which no objection was raised." (D.I. 36, 7–8.) The Court will not enforce terms of a written agreement which, although they may be "reasonable," were not discussed by the parties. Furthermore, although silence in certain circumstances may be a manifestation of assent, here, the parties' practice was to make an offer and acceptance by simultaneous oral communication.

The Court thus finds that an agreement of settlement was reached by the plaintiffs and defendant as reflected in the terms of the plaintiffs' letter of May 30, 1985 (set

---

11. In addition, in the general context of its assertions of complexity, defendant refers to the issue relating to the hand crab winch, and states that its resolution is exclusively within the province of the National Labor Relations Board. But defendant presents no argument here, concedes that this matter was "included in the various offers and acceptances," and "merely calls to the Court's attention that enforcement as to this provision would be an invasion of the province of the Board," citing *International Brotherhood of Boilermakers, Iron Shipbuilders, Blacksmiths, Forgers and Helpers, AFL–CIO v. Hardeman*, 401 U.S. 233, 91 S.Ct. 609, 28 L.Ed.2d 609 (1971). (D.I. 39, 3 n. 1.) However, in that case

the Supreme Court held that the subject matter of the lawsuit was *not* within the exclusive competence of the National Labor Relations Board because the questions presented in that case were not "beyond 'the conventional experience of judges,' nor could the case be said to raise issues 'within the special competence' of the NLRB." 401 U.S. at 238–39, 91 S.Ct. at 613 (citing *NLRB v. Allis-Chalmers Mfg. Co.*, 388 U.S. 175, 181, 193–94, 87 S.Ct. 2001, 2007, 2013, 18 L.Ed.2d 1123 (1967)). The issues in this case concern only questions of contract law, the parties having decided not to litigate the labor disputes.

forth above) and will enforce the terms of that agreement.

Judgment will be entered in accordance with this Opinion.