PUBLISHED

# UNITED STATES COURT OF APPEALS

## FOR THE FOURTH CIRCUIT

JOSE ALEMAN; CESAR BASILIS; JAMES
BLASIC; CARLOS BORRAYO; MARIO
RODAS,

   *Plaintiffs-Appellants,*

    v.

CHUGACH SUPPORT SERVICES,
INCORPORATED; CHUGACH ALASKA
CORPORATION,

   *Defendants-Appellees.*     No. 06-1461

LAWYERS' COMMITTEE FOR CIVIL
RIGHTS UNDER LAW; METROPOLITAN
WASHINGTON EMPLOYMENT LAWYERS
ASSOCIATION; WASHINGTON LAWYERS'
COMMITTEE FOR CIVIL RIGHTS AND
URBAN AFFAIRS,

   *Amici Supporting Appellants.*

Appeal from the United States District Court
for the District of Maryland, at Baltimore.
William D. Quarles, Jr., District Judge.
(1:04-cv-04022-WDQ)

Argued: March 13, 2007

Decided: May 3, 2007

Before WILKINSON and KING, Circuit Judges, and
T. S. ELLIS, III, Senior United States District Judge
for the Eastern District of Virginia, sitting by designation.

Affirmed in part, reversed in part, and remanded by published opinion. Judge Wilkinson wrote the opinion, in which Judge King and Judge Ellis joined.

---

**COUNSEL**

**ARGUED:** Eric Kenneth Bachman, WIGGINS, CHILDS, QUINN & PANTAZIS, P.L.L.C., Washington, D.C., for Appellants. Harvey Alan Levin, THOMPSON & COBURN, L.L.P., Washington, D.C., for Appellees. **ON BRIEF:** Ann C. Robertson, WIGGINS, CHILDS, QUINN & PANTAZIS, P.L.L.C., Birmingham, Alabama, for Appellants. Richard T. Seymour, Washington, D.C.; S. Micah Salb, LIPPMAN, SEMSKER & SALB, L.L.C., Bethesda, Maryland; Michael Foreman, Sarah Crawford, Monica Saxena, LAWYERS' COMMITTEE FOR CIVIL RIGHTS UNDER LAW, Washington, D.C.; Susan E. Huhta, Carolyn P. Weiss, WASHINGTON LAWYERS' COMMITTEE FOR CIVIL RIGHTS AND URBAN AFFAIRS, Washington, D.C., for Amici Supporting Appellants.

---

**OPINION**

WILKINSON, Circuit Judge:

Plaintiffs brought claims against their employer, Chugach Support Services, Inc., and its parent company, Chugach Alaska Corporation, under 42 U.S.C. § 1981 (2000), which prohibits racial discrimination in the making and enforcement of contracts, and Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e-2000e-17 (2000), which prohibits, among other things, employment discrimination based upon race and national origin. The district court granted summary judgment to the defendants on the claims of one plaintiff because it held that Alaska Native Corporations and their subsidiaries were not subject to suit under either of the federal anti-discrimination laws. It dismissed the claims of two other plaintiffs because a collective bargaining agreement required that the claims be addressed through binding arbitration.

We reinstate the claims of the first plaintiff because the exemption for Alaska Native Corporations from suit under Title VII does not immunize the defendants from suit under the separate and independent cause of action established by Section 1981. However, we affirm the dismissal of the union members' claims, because any duty to explain the provisions of a collective bargaining agreement to employees with limited English skills belongs principally with the union which represents them.

I.

The plaintiffs, carpenters Jose Aleman and Cesar Basilis and finance manager James Blasic, were employed by defendant Chugach Support Services, Inc. ("CSS") on construction projects that CSS contracted to perform for the U.S. Department of Health and Human Services at the National Institutes of Health ("NIH") campus in Bethesda, Maryland.[1] CSS performs general contractor services, typically for the federal government, and is a wholly owned subsidiary of defendant Chugach Alaska Corporation, an Alaska Native Corporation owned by Native Alaskans and their devisees.

Alaska Native Corporations play special roles in controlling lands and funds for Alaskan Natives, *see* Alaska Native Claims Settlement Act, Pub. L. No. 92-203, 85 Stat. 688 (1971) (codified as amended at 43 U.S.C. §§ 1601-1629a (2000)), but Chugach Alaska Corporation also operates as a traditional business, employing about 5,000 people in construction, environmental services, information technology, telecommunications, and other areas. The defendants have not alleged that the plaintiffs' work touched in any way on the internal affairs or special functions of the Alaska Native Corporation.

Plaintiff Jose Aleman, who is Hispanic, performed carpentry and other tasks at the NIH site from March 10, 2003 until he was dismissed on September 9, 2003. Plaintiff Cesar Basilis, who is also Hispanic, worked at the NIH site from February 11, 2003, until he was dismissed on October 17, 2003. Plaintiff James Blasic, who describes

---

[1]Two other former employees, Carlos Borrayo and Mario Rodas, were also plaintiffs in the suit when it was filed, but have since voluntarily dismissed their claims with prejudice.

himself as Caucasian and does not claim Hispanic ancestry, worked for CSS from December 2, 2002 until he was dismissed on October 22, 2003.

Aleman and Basilis were required to join the Washington D.C. Regional Council of Carpenters as a condition of their employment, and became members on August 15, 2003. The union's collective bargaining agreement states that it covers the period from May 1, 2001 until April 30, 2004 — a period that includes all of Aleman and Basilis' time as CSS employees. It includes mandatory dispute resolution procedures, including procedures for binding arbitration, with respect to any "grievance" between an employer and an employee represented by the union. It further states,

> The parties expressly agree that a grievance shall include any claim by an employee that he has been subjected to discrimination under Title VII of the Civil Rights Act of 1964, as amended, the Age Discrimination in Employment Act, the Americans with Disabilities Act, and/or all other federal, state, and local anti-discrimination laws.

Blasic was not a union member, evidently because as a finance manager rather than a carpenter he was not required to join the union as a condition of employment. He was therefore not covered by the collective bargaining agreement's dispute resolution provisions.

Aleman and Basilis have apparently not sought to resolve their grievances through the procedures set forth in the collective bargaining agreement, but they allege that they should not be bound by the procedures because they were not provided with a translation of the collective bargaining agreement or its dispute resolution provisions into their native Spanish. Each stated in declarations made as part of this litigation that his ability to speak and write English is limited. Neither plaintiff claimed, however, that he did not or could not understand the arbitration provision in English.

Plaintiffs filed suit on December 27, 2004, claiming unlawful discrimination under Title VII and Section 1981 as well as Maryland law. Aleman and Basilis allege, in particular, that CSS terminated them on the basis of race. They also allege that when they were

employed by CSS, they were paid less than non-Hispanic employees and were subjected to a hostile work environment and discriminatory terms and conditions of employment, including anti-Hispanic statements by managers and employees, segregated eating areas, and disparate disciplinary treatment. They further allege that an "English Only" rule at their workplace constituted unlawful discrimination. The two union members later filed a motion to amend their complaint in order to add their union as a defendant, asserting that the union discriminated against them under the same anti-discrimination statutes by failing to provide equal representation and by employing discriminatory terms and conditions, practices, and/or procedures. They cite, in particular, the union's failure to provide its members with a Spanish translation of the collective bargaining agreement or with the assistance of a translator in interpreting the agreement. The plaintiffs were not required to arbitrate claims against their union.

Blasic alleges that CSS violated the anti-discrimination statutes by terminating him in retaliation for reporting racial discrimination in the company's operations. He states that he was fired one week after reporting to the defendants that Aleman, Basilis, and two other Hispanic employees had been dismissed and that derogatory comments had been made to non-Caucasians at CSS' work site.

On November 7, 2005, the district court granted the defendants' motion to dismiss the claims of Aleman and Basilis on the grounds that their collective bargaining agreement required binding arbitration of claims under Title VII "and/or all other federal, state, and local anti-discrimination laws." The court denied Aleman and Basilis' motion to add the union as a defendant in the same decision. On March 28, 2006, the district court granted summary judgment to the defendants regarding Blasic's Title VII and Section 1981 claims on the grounds that Alaska Native Corporations were exempt from suit under both anti-discrimination statutes. It declined supplemental jurisdiction over the remaining state law claims.

Aleman, Basilis, and Blasic do not now dispute that the defendants are immune from suit under Title VII, but they argue that the defendants are not immune from suit under Section 1981. They also argue that the district court erred in dismissing the claims of Aleman and Basilis based upon the dispute resolution provision in their collective

bargaining agreement, and in declining to add the union as a defendant.

## II.

### A.

Title VII created a new cause of action for employment discrimination against unions, employment agencies, and any entity defined as an "employer." The statute provides, in relevant part,

> It shall be an unlawful employment practice for an employer . . . to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin . . . .

42 U.S.C. § 2000e-2(a). The class of employers covered by Title VII is restricted to persons with fifteen or more employees, and it excludes bona fide private membership clubs, certain government entities, *id.* § 2000e(b), and — most relevantly — Alaska Native Corporations, 43 U.S.C. § 1626(g) (2000), and Indian tribes, 42 U.S.C. § 2000e(b). The defendants argue that these exclusions not only bar suit against Alaska Native Corporations and Indian tribes under Title VII, but also render such entities immune from suit under Section 1981.

We reject this contention for two reasons. By their own terms, the Title VII exclusions are limited to Title VII itself. And Section 1981 — which the Supreme Court has instructed us to treat as a separate and distinct cause of action — contains no exemptions corresponding to those in Title VII.[2]

---

[2]Because employer exemptions under Title VII do not bar suits under Section 1981, we need not address the plaintiffs' contention that the defendants do not qualify as Indian tribes for the purposes of Title VII's employer exemptions in any event.

While the definition of "employer" in Title VII excludes Indian tribes and Alaska Native Corporations, these exclusions state that they are limited to the section of federal law that contains Title VII. The single-sentence exclusion for Alaska Native Corporations makes this clear twice, stating,

> *For the purposes of implementation of the Civil Rights Act of 1964* [42 U.S.C. 2000a *et seq.*], a Native Corporation and corporations, partnerships, joint ventures, trusts, or affiliates in which the Native Corporation owns not less than 25 per centum of the equity shall be within the class of entities excluded from the definition of "employer" by *section 701(b)(1) of Public Law 88-352 (78 Stat. 253), as amended* [42 U.S.C. § 2000e(b)(1)], *or successor statutes.*

43 U.S.C. § 1626(g) (emphasis added). Similarly, the provision excluding Indian tribes from Title VII's definition of employer states, "*For the purposes of this subchapter* . . . [t]he term 'employer' . . . does not include . . . an Indian tribe . . . ." 42 U.S.C. § 2000e (emphasis added). The subchapter containing Title VII does not contain Section 1981.

Section 1981 contains no similar exception for Alaska Native Corporations. Its civil cause of action, enacted as part of the Civil Rights Act of 1866, states, "All persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts . . . as is enjoyed by white citizens . . . ." *Id.* § 1981(a). The Supreme Court has long held the Civil Rights Act of 1866 "to prohibit all racial discrimination, whether or not under color of law, with respect to the rights enumerated therein." *Jones v. Alfred H. Mayer Co.*, 392 U.S. 409, 436 (1968). Congress amended the statute in 1991 to codify this understanding, stating that Section 1981 protects rights "against impairment by nongovernmental discrimination" in addition to "impairment under color of State law." 42 U.S.C. § 1981(c). Section 1981 makes no mention of Alaska Native Corporations or Indian tribes, and it includes no terms that could be construed to set such entities outside the statute's reach.

Indeed, it is hard to imagine how the exclusions of Alaska Native Corporations and Indian tribes from Title VII's definition of "em-

ployer" could control under Section 1981, because Section 1981 does not apply solely to employers or employment discrimination. Section 1981's prohibition on racial discrimination in the making and enforcement of contracts has long been applied to relationships far afield of employment. Black parents established "a classic violation of § 1981" by showing that private schools refused, on the basis of race, to enroll their children. *Runyon v. McCrary*, 427 U.S. 160, 172 (1976). Prospective purchasers of home leaseholds, *Pinchback v. Armistead Homes Corp.*, 907 F.2d 1447, 1448 (4th Cir. 1990), and prospective club members, *Wright v. Salisbury Club, Ltd.*, 632 F.2d 309, 310 (4th Cir. 1980), among others, have availed themselves of the statute's protections. Thus, the Supreme Court wrote in *Johnson v. Railway Express Agency, Inc.* that the limitation of Title VII to those defined as employers is one way in which Title VII is narrower than Section 1981, writing that "Section 1981 is not coextensive in its coverage with Title VII" in part because "the latter is made inapplicable to certain employers." 421 U.S. 454, 460 (1975). While exclusions from the "employer" category are crucial for the Title VII scheme directed at employment discrimination, they thus have lesser relevance under Section 1981's extended protections.

The defendants nevertheless urge that the employer exceptions in Title VII must be read broadly if they are to serve their purpose. Without such a reading, Alaska Native Corporations would be immunized from suit for acts of discrimination under Title VII, but face liability under Section 1981 for some of the same acts — a result that defendants argue would strip the Title VII exemption of any meaning and run counter to what must have been Congress' purpose in enacting the "employer" exceptions. The Tenth Circuit has agreed with defendants, writing that the "specific" provisions of Title VII must be understood to impose limits on the "broad, general provision" of Section 1981, and that Indian tribes are therefore exempt from suit for discriminatory discharge under Section 1981. *Wardle v. Ute Indian Tribe*, 623 F.2d 670, 673 (10th Cir. 1980).

The Supreme Court has foreclosed such a reading of Title VII as intended to amend Section 1981 *sub silentio* in the areas where Title VII is more specific, holding "that the remedies available under Title VII and under § 1981, although related, and although directed to most of the same ends, are separate, distinct, and independent." *Railway*

*Express*, 421 U.S. at 461. "Title VII was designed to supplement rather than supplant, existing laws and institutions relating to employment discrimination," *Alexander v. Gardner-Denver Co.*, 415 U.S. 36, 48-49 (1979), because Congress sought "to accord parallel or overlapping remedies against discrimination," not to overwrite longstanding remedies through its subsequent enactments, *id.* at 48. In sum, an individual aggrieved by acts of employment discrimination "clearly is not deprived of other remedies he possesses and is not limited to Title VII in his search for relief." *Railway Express*, 421 U.S. at 459; *see also Johnson v. Ryder Truck Lines, Inc.*, 575 F.2d 471, 473 (4th Cir. 1978) ("The Civil Rights Act of 1964 did not repeal by implication any part of § 1981.").

We find nothing implausible about Congress' enacting overlapping causes of action or deciding that Alaska Native Corporations should be exempt from suit under Title VII, but not Section 1981. While both Section 1981 and Title VII provide remedies against racial discrimination, Title VII imposes obligations that are in some ways more expansive. To take the most obvious example, Title VII addresses not simply discrimination based upon race or color but also discrimination based upon "religion, sex, or national origin." 42 U.S.C. § 2000e-2(a). A legislature could easily desire to subject only certain entities to the additional strictures of Title VII, while leaving in place the more limited cause of action in Section 1981 that has long been a part of our anti-discrimination law.

In addition, Title VII establishes new remedies for racial discrimination in employment that Congress could have seen as undesirable for Alaska Native Corporations. Under the Title VII framework, a claimant must first lodge a charge with the Equal Employment Opportunity Commission ("EEOC"), *see* 42 U.S.C. § 2000e-5(e)-(f); *Great Am. Fed. Savings & Loan Ass'n v. Novotny*, 442 U.S. 366, 372-74 (1979) — an action that is not a prerequisite to filing a Section 1981 suit. After lodging a charge under Title VII, however, a complainant can benefit from EEOC powers not made available by Section 1981. These include the agency's ability to investigate charges of discrimination, its attempts to remedy noncompliance through voluntary or negotiated changes, and its authority to file a civil action against the offending party and practice itself. *Railway Express*, 421 U.S. at 458. There is nothing paradoxical about Congress' not apply-

ing these arguably more intrusive mechanisms to Alaska Native Corporations, without narrowing the scope of the longstanding, comparatively bare-bones cause of action against racial discrimination provided by Section 1981. In any event, because this is the approach embodied in the language of the two statutes and in the Supreme Court's decisions, the district court erred in holding that plaintiffs could be deprived of a cause of action against Alaska Native Corporations under Section 1981 on the grounds that such defendants are not subject to suit under Title VII.

To be sure, we have recognized Indian tribal immunity as a bar to Section 1981 liability. *See Yashenko v. Harrah's N.C. Casino Co.*, 446 F.3d 541, 551-53 (4th Cir. 2006). But the defendants claim no such immunity here and we find no basis to conclude that the ownership of the defendant corporations by Alaska Natives and their devisees, or any other attribute, entitles the defendants to immunity from suits arising from their for-profit construction activities in Maryland. While the sovereign immunity of Indian tribes "is a necessary corollary to Indian sovereignty and self-governance," *Three Affiliated Tribes of the Fort Berthold Reservation v. Wold Engineering*, 476 U.S. 877, 890 (1986), Alaska Native Corporations and their subsidiaries are not comparable sovereign entities, *see Native Village of Stevens v. Alaska Management & Planning*, 757 P.2d 32, 34 (Alaska 1988) (reviewing differences between Alaska Native groups and Indian tribes and holding most Alaska native groups lack immunity from suit because they are "not self-governing or in any meaningful sense sovereign"); *see also Seldovia Native Ass'n v. Lujan*, 904 F.2d 1335, 1350 (9th Cir. 1990) (holding that Alaska Native Village Corporation "does not meet one of the basic criteria of an Indian tribe" because it "is not a governing body"). In short, Indian tribal immunity does not foreclose Section 1981 relief here.

## B.

The defendants claim that the district court's grant of summary judgment in its favor on plaintiff Blasic's claims for retaliation can be upheld on the alternate ground that Section 1981 does not contain an anti-retaliation provision. They argue that if we fail to apply Title VII employer exemptions to Section 1981, we must likewise decline to import an anti-retaliation principle from Title VII into Section 1981.

This argument fails for two reasons. First, it was not raised in the district court. Second, it is foreclosed by Supreme Court and circuit precedent, which hold retaliation to be a form of differential treatment subsumed in the anti-discrimination language of Section 1981. *Bryant v. Aiken Reg'l Med. Ctrs., Inc.*, 333 F.3d 536, 543 (4th Cir. 2003) (holding that a "plaintiff can prove illegal retaliation under . . . § 1981" in the same manner as he establishes retaliation under Title VII); *see also Jackson v. Birmingham Bd. of Ed.*, 544 U.S. 167, 174-75 (2005) (retaliation for complaints of unlawful discrimination is a form of discrimination). Under these precedents, plaintiffs such as Blasic can challenge as discriminatory actions that were taken against them for reporting unlawful discrimination, even if the plaintiffs were not subject to discrimination based upon their own race, gender, or similar protected status. *See Sullivan v. Little Hunting Park, Inc.*, 396 U.S. 229, 237 (1969) (permitting white plaintiff to bring suit under 42 U.S.C. § 1982's racial discrimination provisions because he suffered retaliation for protesting discrimination against black person); *Jackson*, 544 U.S. at 171 (holding male athletic coach could bring suit under prohibition on sex discrimination in Title IX of the Education Amendments of 1972, because coach alleged that he suffered adverse consequences for protesting discriminatory treatment of female athletes). In sum, the grant of summary judgment against Blasic on his Section 1981 claims cannot be justified on the alternative grounds that Section 1981 does not encompass retaliation claims.[3] Blasic had the right to protest discrimination visited upon Hispanic employees and to proceed under Section 1981 if he lost his job as a result.

### III.

### A.

Plaintiffs also appeal the dismissal of the claims of Aleman and Basilis. The district court based its dismissal upon a provision in Aleman and Basilis' collective bargaining agreement requiring manda-

---

[3]The defendants' similar argument that mixed-motive discrimination is not cognizable under Section 1981 does not appear to have been raised below and was not addressed by the district court. It cannot provide an alternate basis here for affirming summary judgment to the defendants on Blasic's claims.

tory arbitration of discrimination claims. The two union members argue that the provision should not bind them. They have stated in affidavits that their "ability to speak and read English is limited" and "very limited," respectively, and that each has "a very limited ability to read English as compared to Spanish," although neither plaintiff suggested in his affidavit or complaint that he could not read or understand the arbitration provision as written.[4] While Aleman and Basilis point to no statute or precedent indicating an employer must secure translations of a collective bargaining agreement according to union members' relative linguistic skills or preferences, they argue that such a duty is a logical extension of principles of contract law and collective bargaining. We find neither of these sources support such a duty and decline to void the arbitration provision with respect to Aleman and Basilis on these grounds.

Aleman and Basilis first argue that they should not be bound by the arbitration provision in their collective bargaining agreement as an extension or application of "ordinary contract principles." Brief of Appellants at 39. They suggest that because they were not provided with a translated version of the arbitration provision, there was no "meeting of the minds" between themselves and their employer, given that their Spanish skills were stronger than their English skills. Brief of Appellant at 39, 40. In other words, they claim the provision was not binding because there was no true agreement between the parties. *See Restatement (Second) of Contracts* § 17 cmt. c (1981) ("The element of agreement is sometimes referred to as a 'meeting of the minds.'").

Aleman and Basilis' suggestion that the collective bargaining agreement was not binding upon them because they did not truly agree to its terms disregards the "collective" in "collective bargain-

---

[4]Appellants state for the first time in their brief before this court that "Aleman and Basilis did not understand the arbitration provision and would not have understood it unless the company or union had provided them with Spanish translated copies of the arbitration provision." They made no such claims below, however, and make them now only in reliance on Aleman and Basilis' declarations, neither of which states that the affiant did not understand the dispute resolution provision or would not have understood it absent translation. Brief of Appellants at 40.

ing." The National Labor Relations Act gives employees the right "to form, join or assist labor organizations" and "to bargain collectively through representatives of their own choosing." 29 U.S.C. § 157 (2000); *see also id.* § 159(a) (2000). Acceptance by individual union members of individual provisions is not required, because the formation of a collective bargaining unit "extinguishes the individual employee's power to order his own relations with his employer and creates a power vested in the chosen representative to act in the interests of all employees," with the result that "only the union may contract the employee's terms and conditions of employment, and provisions for processing his grievances." *NLRB v. Allis-Chalmers Mfg. Co.*, 388 U.S. 175, 180 (1967) (footnote omitted); *see also J.I. Case Co. v. NLRB*, 321 U.S. 332, 336 (1944) (describing employee's status under collective bargaining agreement as analogous to that of "third party beneficiary").

It is natural that a union member might desire higher wages or more generous benefits or different working conditions than an agreement provides. Still, in a representative negotiation, he "is bound" by it. *Allis-Chalmers Mfg. Co.*, 388 U.S. at 180. As a result, when courts have spoken of the "meeting of the minds" required for a *collective* bargaining agreement, it has been a "meeting of the minds" between an employer and a union, not between an employer and each and every individual union member. *See, e.g.*, *United Steelworkers of Am. v. Bell Foundry Co.*, 626 F.2d 139, 141 (9th Cir. 1980); *see also, e.g.*, *Ekas v. Carling Nat'l Breweries, Inc.*, 602 F.2d 664, 666-67 (4th Cir. 1979) (modification of collective bargaining agreement was valid when union and employer assented, despite objections of some employees); *Eastern Air Lines, Inc. v. Air Line Pilots Ass'n, Int'l*, 861 F.2d 1546, 1553-54 (11th Cir. 1988) (collective bargaining agreement was binding when union and employer manifested assent).

Nor can we find a basis for Aleman and Basilis' novel duty of translation in the settled requirement that a collective bargaining agreement contain a "clear and unmistakable" waiver of the right to a federal judicial forum in order to require the binding arbitration of statutory discrimination claims. *Wright v. Universal Maritime Serv. Corp.*, 525 U.S. 70, 80 (1998). As the precedents of the Supreme Court and our circuit have established, this is a principle of clear drafting, which ensures that the federal forum for such claims is

waived only when the union and employer clearly intended such a waiver. Thus, the Supreme Court has explained this requirement to mean that the federal-forum waiver must be "'explicitly stated,'" *id.* (quoting *Metropolitan Edison Co. v. NLRB*, 460 U.S. 693, 701 (1983)), and that an employee is not required to arbitrate federal employment discrimination claims when the collective bargaining agreement "does not contain a clear and unmistakable waiver of the covered employees' rights to a judicial forum," *id.* at 82.

Our circuit has thus read *Universal Maritime* to require that collective bargaining agreements eliminate any doubt that a waiver of a federal forum was intended. *Universal Maritime*, we have noted, "indicates that the requisite degree of clarity can be achieved by two different approaches." *Carson v. Giant Food, Inc.*, 175 F.3d 325, 331 (4th Cir. 1999). First, provisions that require arbitration of disputes without mentioning statutory claims nonetheless require arbitration of statutory claims if the rest of the agreement "makes it unmistakably clear" that a violation of discrimination laws constitutes a grievance or dispute under the agreement. *Id.* at 332. Second, an agreement requires arbitration of statutory discrimination claims if it contains "an explicit arbitration clause" referring to statutory claims, which would require in the case of an agreement to arbitrate all federal employment claims "a clear and unmistakable provision under which the employees agree to submit to arbitration all federal causes of action arising out of their employment." *Id.* at 331.

The collective bargaining agreement to which Aleman and Basilis were subject met the *Universal Maritime* test. The agreement provided mandatory dispute resolution mechanisms for grievances and stated, "The parties expressly agree that a grievance shall include any claim by an employee that he has been subjected to discrimination under Title VII . . . and/or *all other federal, state, and local anti-discrimination laws*" (emphasis added). The agreement thus satisfied the requirement of "clear and unmistakable" waiver, notwithstanding plaintiffs' suggestion, contrary to our precedent, that "clear and unmistakable" waiver requires a meeting of the minds between the employer and individual union members. As Aleman and Basilis cite no statute or precedent that can form a basis for the new duty they propose, we decline to place upon employers a requirement we find without basis in law.

Indeed, to the extent that the plaintiffs assert that employers must provide translations of agreements on the theory that union members must individually consent to the waiver of a federal forum for statutory discrimination claims, their argument is contrary to our cases establishing that unions are entitled to strike bargains that require arbitration of such claims. We have repeatedly held that such matters are among the subjects about which unions may bargain under the National Labor Relations Act. We have observed that unions have the right — indeed, the duty — to bargain with employers on their members' behalf over "terms and conditions of employment," *see* 29 U.S.C. § 158(d) (2000), and that the method through which employers and union members resolve disputes is a preeminent term or condition of employment. *Safrit v. Cone Mills Corp.*, 248 F.3d 306, 308 (4th Cir. 2001) (citing *Austin v. Owens-Brockway Glass Container, Inc.*, 78 F.3d 875, 885 (4th Cir. 1996); *Textile Workers v. Lincoln Mills*, 353 U.S. 448 (1957); *Metropolitan Edison Co.*, 460 U.S. at 705). As a result, "Union-negotiated collective bargaining agreements that require the arbitration of statutory discrimination claims are valid and binding on unionized employees." *Carson*, 175 F.3d at 331; *see also Safrit*, 248 F.3d at 308; *Austin*, 78 F.3d at 880-85; *Brown v. ABF Freight Sys., Inc.*, 183 F.3d 319, 321 (4th Cir. 1999).

The enactment of civil rights laws against discrimination does not by itself mean the Congress intended to place the resolution of such claims beyond the reach of arbitration. Congress could do this, of course, but it has not yet done so. To hold otherwise would be too much an exercise in judicial implication. The scope of the arbitration provision must be of a "clear and unmistakable" character no doubt, but to say there can be no waiver at all is to change the nature of collective bargaining over conditions of employment and to read judicial exceptions into the National Labor Relations Act.

## B.

Aleman and Basilis, however, argue that an employer's duty to provide translations of the agreement to employees with deficient English skills renders the foregoing principles inoperative and voids the collective bargaining agreement's dispute resolution provision. Aleman and Basilis argue that their proposed duty would be minimally disruptive because this court could simply require that "if an

employer has notice that certain employees cannot communicate effectively in English, the employer must take reasonable steps to ensure that these employees understand the arbitration provision." Reply Brief of Appellants at 20.

To begin with, the duty is much too benignly described. The employer is under no remedial order, and the basis of the duty in law is as vague as its obligations are significant. The number of employees who could invoke this principle to escape collective bargaining provisions of all sorts would be vast, since the degree of linguistic deficiency needed to invoke the duty is unclear, and plaintiffs would evidently require employers to secure translations on behalf of employees — such as themselves — who evidently speak and read some English. Ostensibly, Aleman and Basilis' proposed duty would apply only when employers had notice of limited language skills, but the plaintiffs would hold employers to be on notice of limited language skills even where — as here — there is no allegation that the plaintiffs or their union told the defendants of Aleman or Basilis' language limitations.

Even if employers could determine when they were subject to this new duty, it is unclear just what "reasonable steps" employers would be required to take in order to render the negotiated collective bargaining agreement fully comprehensible and thus enforceable. Aleman and Basilis offer no more than passing suggestions as to how this duty could be discharged, contending that perhaps employers could fulfill the obligation through posted translations at the work site. But conceivably, the new duty could require translations in many different languages, and the quality and accuracy of the translations would likely be at issue. The threat of voidability under this opaque employer obligation would cast a pall over collective bargaining as a technique for resolving labor disputes, for neither side could be certain when deals would bind the parties and when they would wholly or partially unravel with respect to many of those they purported to cover.

The disruption that the plaintiffs' proposed duty threatens is only compounded by plaintiffs' suggestion that employers could fulfill their duty of translation by ensuring that unions faithfully communicated the contents of collective bargaining agreements to union mem-

bers. It would be dicey to say the least for an employer to seek to compel a union to fulfill what the employer regards as the union's obligations to those it represents. *See NLRB v. Electra-Food Machinery, Inc.*, 621 F.2d 956, 958 (9th Cir. 1980) (holding that employer overstepped its role when it refused to enter into written collective bargaining agreement because it believed union's entering the deal would violate union constitution). Nor could the employer step in easily on its own. Unions and employers may well disagree on the nature of collective bargaining agreement obligations, and encouraging excessive employer involvement in union affairs may generate "collateral issues" which might themselves "become the source of dispute and litigation." *Id.* By suggesting that internal union matters, including unions' internal communications, can affect the validity of a collective bargaining agreement, the plaintiffs would force employers to engage in intrusive oversight of their bargaining partners.

The proposed employer duty to provide union members with collective bargaining agreement translations is fraught with problems that only Congress or other policy-making bodies could sort out. Whatever duty might arise in this regard between unions and their members is a question that is not before us.[5] *See Zamora v. Local 11,*

---

[5]Aleman and Basilis did not name the union as a defendant in their complaint. We affirm the denial of Aleman and Basilis' motion to amend their complaint to add their union as a defendant, considering "both the general principles of amendment provided by Rule 15(a) and also the more specific joinder provisions of Rule 20(a)." *Hinson v. Norwest Financial S.C., Inc.*, 239 F.3d 611, 618 (4th Cir. 2001) (citing *Desert Empire Bank v. Insurance Co.*, 623 F.2d 1371, 1374 (9th Cir. 1980)).

Rule 20 gives courts wide discretion concerning the permissive joinder of parties, and "should be construed in light of its purpose, which 'is to promote trial convenience and expedite the final determination of disputes, thereby preventing multiple lawsuits.'" *Saval v. BL, Ltd.*, 710 F.2d 1027, 1031 (4th Cir. 1983) (quoting *Mosley v. General Motors Corp.*, 497 F.2d 1330, 1332 (8th Cir. 1974)). "[T]he court has discretion to deny joinder if it determines that the addition of the party under Rule 20 will not foster the objectives of the rule, but will result in prejudice, expense, or delay." 7 Charles Alan Wright, Arthur R. Miller & Mary Kay Kane, *Federal Practice and Procedure* § 1652 (3d ed. 2001). Aleman and Basilis were not required to arbitrate claims against their union, but join-

817 F.2d 566, 569-71 (9th Cir. 1987) (stating that union rule of not providing appropriate translation assistance at monthly meetings deprived non-English speaking members of right to participate in deliberations); *Retana v. Apartment, Motel, Hotel & Elevator Operators Union*, 453 F.2d 1018, 1023-25 (9th Cir. 1972) (stating that union's failure to provide Spanish-speaking members with translation of collective bargaining agreement and other translation assistance could violate duty of fair representation). The employer duty of translation that Aleman and Basilis propose is, however, as at odds with the aims of collective bargaining as it is without foundation in statute and precedent.

## C.

Since Aleman and Basilis were bound by the collective bargaining agreement, they were required to resolve their discrimination claims through the procedures it provided, because the claims arose during the agreement's stated coverage period. The agreement sets forth mandatory dispute resolution procedures for any "grievance . . . arising during the term of this Agreement" between an employer and a union member, including "any claim by an employee that he has been subjected to discrimination under Title VII of the Civil Rights Act of 1964, as amended, . . . and/or all other federal, state, and local anti-discrimination laws." The "term of the agreement" is defined repeatedly as May 1, 2001 until April 30, 2004 — a period that includes all the time Aleman and Basilis worked for CSS. This period is set out twice on the agreement's initial page, which contains the dates "May 1, 2001 - April 30, 2004" near the top of the pact, above the word "Agreement." The agreement goes on to state:

> The undersigned employer accepts each and every provision
> of the Collective Bargaining Agreement between the Con-

---

ing new claims against a new party with now-dismissed claims would not promote the above objectives and the district court did not err in denying leave to amend.

Since the motion to add the union as a defendant was properly denied, we express no view on any possible claim that Aleman and Basilis might have against their union.

struction Contractors Council, Inc. — A.G.C. Labor Division and the Washington D.C. Regional Council of Carpenters, *effective May 1, 2001 to an[d] including April 30, 2004* and adopts said Agreement and each and every provision thereof as its own collective bargaining agreement with The Washington, D.C. Regional Council of Carpenters.

(emphasis added). It specifies the same dates in the article on "duration of agreement," which states, "This Agreement shall be in full force and effect from May 1, 2001, to and including April 30, 2004 . . . ."

Plaintiffs suggest that other dates should define the agreement's temporal scope, but those dates have no operative significance under the deal's terms. Representatives of CSS and the union did not sign the agreement until July of 2003, as Aleman and Basilis note, but the agreement does not define its scope according to the dates of signing. And while Aleman and Basilis observe that they did not themselves join the union until August of 2003, when they did so, they bound themselves to arbitrate any grievances arising during the term of the agreement as repeatedly set forth in the agreement's text. Since the pact requires arbitration of all grievances arising during the term from May 1, 2001 to April 30, 2004, Aleman and Basilis' claims were properly dismissed on the basis of the dispute resolution provisions.

## IV.

For the foregoing reasons, the judgment is affirmed in part, reversed in part, and remanded for further proceedings consistent with this opinion.

*AFFIRMED IN PART,*
*REVERSED IN PART,*
*AND REMANDED*